Althea G. SELF, formerly Althea G. Williams, Appellant,

v.

C. F. HANSON, Deputy Commissioner, Thirteenth Compensation District; Morrison-Knudsen Co., Inc., a corporation; Peter Kiewit Sons, Inc., a corporation; and Liberty Mutual Insurance Company, a corporation, Appellees.

No. 16928.

United States Court of Appeals
Ninth Circuit.

June 29, 1962.

Henry C. Clausen, Richard G. Burns, and Sheldon C. St. Clair, San Francisco, Cal., for appellant.

Harold C. Nystrom, Acting Solicitor of Labor, Herbert P. Miller, Assistant Solicitor of Labor, Dept. of Labor, Washington, D. C., William H. Orrick, Jr., Asst. U. S. Atty. Gen., Morton Hollander, Mark R. Joelson, Attorneys, Dept. of Justice, Washington, D. C., Cecil F. Poole, U. S. Atty., and Robert N. Ensign, Asst. U. S. Atty., San Francisco, Cal., for appellees.

Before CHAMBERS, JERTBERG and KOELSCH, Circuit Judges.

CHAMBERS, Circuit Judge.

There is a shore line highway on the Island of Guam which runs westerly about three miles from Agana to a place called Schroeder Junction, thence on to a finger-like peninsula called Cabras Island, thence the length of Cabras Island (two miles), continuing on top of Crystal Breakwater for its three-mile length, and finally terminating in a turn-around area at the west or seaward end of the breakwater.

About 11:00 p. m. March 3, 1949, Althea G. Williams (now Self) and Alexander C. Muzzy were sitting in the cab of a small truck parked in the turn-around area. They had been there some twenty or thirty minutes when an army weapons carrier from nearby Harmon Air Force Base, running out of the control of its driver (one Corporal Seabourn), crashed into the right side of the cab of the truck at a point on the right door against which Mrs. Self was sitting. She suffered considerable spinal injuries, the permanence and seriousness of which remain disputed.

In attempting to fix liability on the United States under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346; 2671 et seq., Mrs. Self has twice before placed her case before this court, Williams v. United States, 9 Cir., 215 F.2d 800, reversed 348 U.S. 926, 75 S.Ct. 338, 99 L.Ed. 726; Williams v. United States, 9 Cir., 248 F.2d 492, certiorari denied 355 U.S. 953, 78 S.Ct. 537, 2 L.Ed.2d 529, but we ultimately held the United States insulated from such liability by virtue of Corporal Seabourn's unauthorized use of the weapons carrier.

Now, in the posture of a claim for compensation under the Longshoremen's and Harbor Workers' Compensation Act,[1] we are, for the third time, confronted with questions of authorized use and scope of employment—but this time with respect to Mrs. Self and her employers Morrison-Knudsen Co., Inc., and Peter

1. The claim was made under the Longshoremen's and Harbor Workers' Compensation Act of 1927, 44 Stat. 1424, 33 U.S.C.A. § 901 et seq., as extended by the Defense Base Act of 1941, 55 Stat. 622, 42 U.S.C.A. §§ 1651–1654.

Kiewit Sons, Inc., not to Corporal Seabourn and his employer, the United States. We now conclude that Mrs. Self should recover.[2]

To summarize this conclusion, it is our view that both Muzzy's and Mrs. Self's conduct was, at that time and place and in that vehicle, within the scope of their employers' authorization to such extent that, had they been the cause, not the victims, of the negligent driving, their employers would have been liable to injured third parties for their acts. We think the same rule applies in this compensation case.

Now, some more facts: In November, 1948, Mrs. Self, then 26 years of age and (we take it) unmarried, lived in Palo Alto, California. The Morrison-Knudsen and Peter Kiewit Companies (herein "MK-PK," as they were known on the island) had a joint construction contract to be performed in Guam. At Sausalito, about 40 miles from Palo Alto, they were recruiting stateside men and women to go to Guam to work for them. Mrs. Self, an experienced stenographer and clerk, became one of these people, entering into a written employment contract whose terms consumed some 28 pages of ordinary typing or 2 pages of fine print. Mrs. Self was employed as a stenographer, and she was obligated to stay in Guam at least a year, although MK-PK were not required to keep her that long. For their part, MK-PK agreed to pay her a starting salary of $48 a week, to provide her room and board at $1.50 per day, and to transport her on the round-trip from Sausalito to Guam, although the "homeward" leg of the journey was conditioned on her performing the contract.

On arrival in Guam she was given quarters in the women's compound at Edusa along with about 150 or 200 other women. The regular meals were at a nearby mess hall. Also, her work for eight hours a day (and usually overtime on Saturday) was performed at a nearby building in which MK-PK had space. About a week before the accident she had advanced from stenographer to Muzzy's secretary. Her salary, including overtime pay, had increased to about $68 a week. In the testimony Muzzy is described as "part of the MK-PK 'brass' on the job." His title was Superintendent of Supply Yards and Docks. Normally he worked eight hours a day, but was on 24-hour call.

The Edusa headquarters seems to have been ten to twelve miles northeast of Agana, and somewhere in between was the Harmon Air Force Base. Some weeks before the accident Mrs. Self had sought and obtained from MK-PK permission to teach evenings in a school for adults located across the road from the air base. Apparently it was sponsored by the 20th Air Force for air force and military personnel, their families, and civil service workers. Mrs. Self taught there four hours a night, four nights a week, from 6:00 p. m. to 10:00 p. m., at a salary of a dollar an hour.

There was no public transportation system available in the Edusa-Harmon area. One had to depend on rides either in government cars of military personnel or MK-PK cars and light trucks. Both seem to have been plentiful. (Apparently the army engineers and MK-PK used the same motor pool area at Edusa for their motor vehicles.) Muzzy had a permanent trip ticket. In writing, he was authorized to use the vehicles for recreational purposes without limit except to the island. (Of course, the agreement provided he was responsible for negligent damage to the vehicle and its loss.) And it seems apparent that MK-PK was maintaining the car and, we assume, furnishing the gasoline.[3] Mrs. Self had taken

2. The claim was rejected by the Deputy Commissioner of Labor, and on review the United States District Court for the Northern District of California sustained the commissioner.

3. Mrs. Self testified, "MK-PK provided you with your transportation to anywhere [on the Island] and back." While the hearing officer could have disbelieved this, it is suggested that it should be accepted as

and passed the quartermaster examination for a government "driving license," which apparently was required by MK-PK and the Engineers, who supplied the cars to MK-PK. She was authorized to drive passenger cars, station wagons and small trucks. She testified, and it seems uncontradicted, that she was authorized to draw a car, a trip at a time, for the same recreational purposes. However, there is no record of her drawing a car. Women, especially at night, were not encouraged to drive the cars.

The MK-PK vehicles were used regularly by employees to get to and from the Edusa school, all with the approval of MK-PK, and apparently as a fringe benefit to employees. It is apparent if you were an MK-PK employee you didn't take your car to Guam or buy one.

Mrs. Self had been accustomed to travel to and from the school with a Mr. and Mrs. Wenk, employees of MK-PK, in an MK-PK car, all of which was authorized. On the night of March 3, 1949, the Wenks were to return at 8:00 p. m. to Edusa, and Mrs. Self had to teach until 10:00 p. m. Under the circumstances, aware of the situation, Muzzy had agreed to pick up his new secretary at the school and take her back to Edusa. If it was a personal attraction to Mrs. Self that prompted him to do so, he was nonetheless about a half hour late. Mrs. Self had to wait for him at the nearby post exchange.

Upon arrival at the post exchange, Muzzy informed Mrs. Self that he had to drive, not northeast, but west to the Builders' Club to make arrangements for a surprise party for the controller of the joint operation of MK-PK, who was about to leave, either permanently or temporarily. The club was west of Agana. To reach it one made a left turn off the shore line highway at Schroeder Junction and drove inland about a mile and a half. But Muzzy didn't make the left hand turn. He kept straight on the shore line highway, out over Cabras Island and on

to the extreme westerly (or turn-around) point on the breakwater. There the two parked in the car. They say they went to take a look at a new Japanese ship in the harbor Muzzy wanted to see or show to Mrs. Self.

There has been some cynicism about the parking. It could be argued that Muzzy and Mrs. Self could not possibly have been looking at the ship because there were intervening high rocks that would have obstructed their view of the ship. But this may not be true. The view would depend on where the truck was parked, and the truck was only approximately located by the witnesses as to its position in the area.

But whether it was the ship they detoured to see en route to the Builders' Club or the attraction of each other that carried them there, we hold there was coverage.

Here was a situation where one really had no life but the company's life. Employees were restricted to a most limited portion of the island which itself provided narrow limits of confinement: its area of 206 square miles was covered by very few roads. And the effect of Guam's remoteness from other civilization—particularly Sausalito (or Palo Alto) and the mainland for Mrs. Self—was emphasized by stringent company regulations regarding departure from the island.

In these circumstances, it is not surprising that MK-PK had to provide inducement for its recruits by providing for their recreation. This they chose to do by sponsoring organized trips and projects and supplying cars for unsupervised recreation. And in these circumstances, it is not surprising to find employees at the end of Crystal Breakwater, where Mrs. Self and Muzzy parked, for this area was patrolled by a military sentry and was one of the very few points on the island's roads where MK-PK employees were authorized to go for recreation.

---

true. No effort, except as to the extent of her injury, was made to contradict any of her testimony. Most of it, if untrue, was readily capable to disproof. If MK-

PK provided one transportation anywhere, it is fair to assume they bought the gasoline.

No doubt if Muzzy had been injured his case would have been somewhat stronger than Mrs. Self's. But we think in the peculiar circumstances here it was company business for him to go to Harmon and take her home to Edusa. It was company business for her to go back to company quarters from school. Further, although the road travelled was the long way around and it may have been for recreation, still we hold it within the scope of the employment.

We do not think the case is to be tested by the conventional mainland case where the truck driver departs from his authorized route for his private personal convenience. And we do think this is a case where scope of employment should be construed in favor of the workman and requires the same liberal approach indicated in Central Copper Co. v. Klefisch, 34 Ariz. 230, 270 P. 629. Of course, that case varies as to the nature of the claim, and there are many fact differences.

While we do not regard this as an ad hoc, one trip decision, we do regard it as one of limited application in a situation where a recreational void had to be filled by the company. Obviously, recreation was considered a necessity for MK-PK employees in Guam, the more so because of the restricting conditions mentioned above (and see our second Williams opinion, supra), and the companies affirmatively provided the method and the means, supervised and unsupervised, including the maintaining of cars which were made available to employees under circumstances amounting to more than mere bailments. Further, as we have indicated, the places where the employees could go were designated.

And so we have concluded that Mrs. Self's injury was one "arising out of and in the course of employment" within the Longshoremens' Act, supra. Our conclusion is not a novel one, having been, we feel, presaged by our second Williams decision, supra. And this court reached a similar result in the earlier, analogous, case of Hastorf-Nettles, Inc. v. Pillsbury, 9 Cir., 203 F.2d 641. There, an employee of a subcontractor on an Alaska military base construction job was faced with restricting conditions like those facing Mrs. Self here: there was a dearth of transportation and recreation facilities at the isolated construction site, and it became the custom of the prime contractor's vehicle drivers to give rides to all employees, including those of subcontractors. The employee in that case had been engaged in recreation, not company (-) scheduled or directed, in a town some forty miles from the construction site, to which he had planned to return by train (he already had his ticket), but he was offered a return ride by a prime contractor's truck driver, which he accepted. The injury which he received on the drive back we found to have occurred "in the course of employment" under the same provision of the Longshoremen's Act.[4]

We consider our decision consistent with the liberal purpose of the act.

Judgment reversed for proceedings consistent with this opinion.

---

4. In considering cases applicable to Mrs. Self, it is necessary to run across a broken field. This court, in arriving at its conclusion within set forth, is greatly influenced by its reading of the following cases: The second Williams case, supra; Hastorf-Nettles, Inc., v. Pillsbury, supra; Boynton v. McKales, 139 Cal.App.2d 777, 294 P.2d 733; Shell Oil v. Industrial Accident Commission, 199 A.C.A. 457, 18 Cal. Rptr. 540; Cox v. Enloe, 50 Ariz. 201, 70 P.2d 331; Strauss v. Industrial Accident Commission, 73 Ariz. 285, 240 P.2d 550; Employers Mut. Liability Ins. Co. v. Konvicka, 5 Cir., 197 F.2d 691; Henry v. Lit Brothers, 193 Pa.Super. 543, 165 A.2d 406; Reinert v. Industrial Accident Commission, 46 Cal.2d 349, 294 P.2d 713; Babcock v. Tam, 9 Cir., 156 F.2d 116; Winter v. Industrial Accident Commission, 129 Cal.App.2d 174, 276 P.2d 689.