**KALAMA SERVICES, INC; Cigna Property and Casualty Insurance Company, Petitioner,**

v.

**DIRECTOR, OFFICE OF WORKERS COMPENSATION PROGRAMS, Respondent.**

No. 02–72578.

United States Court of Appeals, Ninth Circuit.

Submitted Dec. 2, 2003.*

Filed Jan. 15, 2004.

* The panel unanimously finds this case suitable for disposition without oral argument. *See*

Fed. R.App. P. 34(a)(2)(C).

---

Keith L. Flicker and Kenneth M. Simon, Flicker, Garelick & Associates, New York, NY, for the petitioners.

Jay Lawrence Friedheim, Admiralty Advocates, Honolulu, Hawaii, for the respondent.

Before TASHIMA, THOMAS, and SILVERMAN, Circuit Judges.

SILVERMAN, Circuit Judge:

We hold today that the Benefits Review Board did not err in ruling that injuries suffered by an off-duty employee during foreseeable horseplay in a bar on Johnston Atoll arose out of a "zone of special danger" created by the isolation of the island and the limited recreational opportunities available there.

### Facts and Procedural History

Johnston Atoll is a United States possession, located about 700 miles west-southwest of Hawaii in the Pacific Ocean.[1] It is only two miles long and one-half mile wide. The United States military uses the atoll to store and dispose of chemical, nuclear, and other toxic weapons. Certain standards govern the conduct of inhabitants at all times during their stay on the atoll. For example, gambling and fighting are prohibited.

The United States government contracted with Kalama to provide operational and maintenance services on the atoll. In August 1996, Kalama hired Michael Ilaszczat to manage the Self Help Store on the atoll. The Self-Help Store serves local residents with materials and tools for projects. In December 1996, Ilaszczat injured his left leg in a work-related accident. As a result of this injury, Ilaszczat had a total left knee replacement in December 1998.

On July 25, 1999, Ilaszczat injured his left hip. The hip injury is the subject of the instant claim. At about 9:30 p.m. on July 24, 1999, after completing his work for the day, Ilaszczat went to the Tiki Bar, which is one of several authorized social clubs on Johnston Atoll. At the Tiki Bar, Ilaszczat consumed two mixed drinks and played pool. He stayed at the Tiki Bar until it closed at about 12:30 a.m. on July 25. Ilaszczat then went to the AMVETS, another social club on the atoll, where he had two more mixed drinks.

There are conflicting accounts of precisely what transpired at the AMVETS, but it is undisputed that Ilaszczat fell and injured his hip there. According to Ilaszczat, he approached a group of soldiers and bought them drinks. These soldiers in-

---

1. For a history of Johnston Atoll, see *Farrell v. United States*, 313 F.3d 1214, 1216–18 (9th Cir.2002).

cluded Private Clyde Burum and Private Benjamin Sanchez. Ilaszczat offered to play the soldiers a game of pool for $10 per game or $10 per ball, but none of the soldiers was interested. Ilaszczat then left the soldiers and played a game of pool by himself.

Ilaszczat returned shortly thereafter. He described his second encounter with the soldiers as follows:

> [T]here was a couple of the military guys sitting at the bar and somehow the subject got around to martial arts.... [Burum] said he was really good at it and I said, "Well, you can't be that good at it, you know, because your hand's all screwed up." I found out later he put it through a window.... [H]e said that he could take his leg and put it over my head without touching me.... I said, "That's impossible. ... I'm almost six foot tall." ... [H]e says, "No, I can do that." I says, "Look, I'm not into that kind of crap." ... I took my card out and I showed him my card where I got the artificial knee and I rolled up my pants to show him the scar on my other leg and he says, "No, I can do it without touching you." ... [H]e was pretty insistent upon showing me how he could lift my [sic] leg over my head without touching me.... So, I went to the back of the room where the pool table and that picnic table [were] and I put my drink down on the picnic table and when he went to kick me, his foot only came up to here and I blocked it and I turned around and I said, "No, that's it. Bullshit." ... And I picked up my drink to walk away and the next thing I know I was on the ground and my hip was broken.

Ilaszczat initially testified he had no interest in participating in the demonstration, but he later conceded he had bet Burum $100 that Burum could not put his leg over Ilaszczat's head without touching him. In describing how he had fallen to the floor, Ilaszczat testified that Burum may have "swept" his foot out from under him, or kicked him.

Burum and Sanchez offered a different account. They testified that Ilaszczat bragged he was too fast for anyone to knock him to the ground or kick him in the knee, even with his total left knee replacement. They claim that Ilaszczat sustained his injury when he "charged" at Burum immediately after the demonstration, lost his balance, and then fell to the ground. The ALJ found Ilaszczat's account to be more credible than that of Burum and Sanchez.

After the demonstration, paramedics and a police officer arrived on the scene.[2] Ilaszczat was taken to the Kalama Services Clinic, where he remained for two days, and was subsequently transferred to Hawaii for hip surgery. While recovering from surgery, Ilaszczat received a debarment order from the Johnston Atoll military commander. The order barred Ilaszczat from the island and prohibited him from ever returning as a result of the "physical altercation" that took place on July 25, 1999. Kalama terminated Ilaszczat's employment based on the debarment order. Ilaszczat moved to Honolulu, Hawaii.

Ilaszczat filed a claim for workers' compensation benefits under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901 *et seq.* ("LHWCA"), as extended by the Defense Base Act

---

**2.** Ilaszczat told the police officer he had just finished playing pool and was walking back to his chair when his knee gave out and he fell down. Ilaszczat admitted he had lied to the police officer because he did not want to be accused of having engaged in an "altercation," which constitutes grounds for expulsion from Johnston Atoll.

("DBA"), 42 U.S.C. §§ 1651 *et seq.* His claim proceeded to trial before an ALJ in Honolulu. At trial, Ilaszczat and Kalama stipulated, among other things, that Ilaszczat: (i) was temporarily totally disabled from July 25, 1999, to January 1, 2000; (ii) attained maximum medical improvement on January 1, 2000; and (iii) has been permanently partially disabled since January 1, 2000.

The ALJ found that Ilaszczat had established a sufficient causal relationship between his injury and his employment, and awarded him disability benefits. Kalama appealed to the Benefits Review Board, which affirmed the ALJ's decision. Kalama subsequently filed a timely petition for review in this court. We have jurisdiction under 33 U.S.C. § 921(c). *See Edwards v. Dir., Office of Workers' Comp. Programs,* 999 F.2d 1374, 1375 (9th Cir.1993).

### Standards of Review

We review BRB decisions for errors of law and for adherence to the substantial evidence standard, which governs the Board's review of an ALJ's factual determinations. *Sestich v. Long Beach Container Terminal,* 289 F.3d 1157, 1159 (9th Cir.2002). The BRB "may not substitute its views for those of the administrative law judge or engage in a *de novo* review of the evidence." *Stevens v. Dir., Office of Workers' Comp. Programs,* 909 F.2d 1256, 1257 (9th Cir.1990). Rather, the Board must accept the ALJ's findings of fact "unless they are contrary to the law, irrational, or unsupported by substantial evidence." *Sestich,* 289 F.3d at 1159.

### Discussion

Congress passed the Defense Base Act in order to provide workers' compensation coverage for certain classes of employees working outside the continental United States. *Pearce v. Dir., Office of Workers' Comp. Programs,* 603 F.2d 763, 765 (9th Cir.1979). Rather than draft a new workers' compensation scheme, Congress used the DBA to extend the LHWCA to apply to the newly-covered workers. *Id.* The parties agree that the LHWCA, as extended by the DBA, applies in this case.

We apply the following burden-shifting proof scheme in LHWCA cases. The claimant bears the initial burden of showing that a work-related injury prevents him from performing his former job. *See Edwards,* 999 F.2d at 1375. If the claimant makes this showing, the burden shifts to the employer to demonstrate that suitable alternative employment is available to the claimant. *See id.* An employer may satisfy this burden in two ways. *See Norfolk Shipbuilding & Drydock Corp. v. Hord,* 193 F.3d 797, 800 (4th Cir.1999). The employer itself may make suitable alternative employment available to the injured employee. *See id.* Alternatively, the employer may show that suitable alternative employment is available to the injured worker in the "relevant labor market." *See id.* If the employer satisfies this burden, the claimant may rebut the employer's evidence of suitable alternative employment with evidence showing a diligent but unsuccessful search for such employment. *See Edwards,* 999 F.2d at 1376, n. 2. If the employer does not satisfy its burden of showing available alternative employment, it must pay the claimant disability benefits. *Id.* at 1375.

In this case, Kalama does not dispute that Ilaszczat satisfied the burden of demonstrating that his injury prevented him from performing his former job. Thus, the burden shifted to Kalama to establish that suitable alternative employment was available to Ilaszczat, either within Kalama or in the "relevant labor market." However, Kalama contends that because Ilaszczat's own misconduct caused him to be barred from Johnston Atoll, it should be

excused from having to make any showing of available alternative employment.

With these principles in mind, we now turn to Kalama's challenge to the BRB's decision.

## I. "Zone of Special Danger"

 Kalama first argues that Ilaszczat is not entitled to disability benefits under the Longshore and Harbor Workers' Compensation Act because his injury was not related to his employment. To establish entitlement to benefits, a LHWCA claimant bears the burden of proving that his injury "[arose] out of and in the course of [his] employment." 33 U.S.C. § 902(2); *Dir., Office of Workers' Comp. Programs v. Greenwich Collieries,* 512 U.S. 267, 114 S.Ct. 2251, 129 L.Ed.2d 221 (1994). This standard "is not confined by common law conceptions of scope of employment." *O'Leary v. Brown–Pacific–Maxon,* 340 U.S. 504, 506, 71 S.Ct. 470, 95 L.Ed. 483 (1951). For example, an employee need not establish a causal relationship between his employment and the accident that occasioned his injury. *Id.* at 506–07, 71 S.Ct. 470. "Nor is it necessary that the employee be engaged at the time of the injury in activity of benefit to his employer." *Id.* at 507, 71 S.Ct. 470. Rather, "all that is required is that the 'obligations or conditions' of employment create the 'zone of special danger' out of which the injury arose." *Id.*

In *O'Leary,* an employee working in Guam spent an afternoon at his employer's recreational center, which was adjacent to a dangerous river channel in which swimming was prohibited. 340 U.S. at 505, 71 S.Ct. 470. After observing two men near the channel signal for help, the employee jumped into the channel to attempt to rescue an unknown man, but drowned during the rescue attempt. *Id.* The employee's dependent mother filed a claim for death benefits with the appropriate bureau

in the U.S. Department of Labor (the "agency"). *Id.* The agency granted her claim. *Id.* at 506, 71 S.Ct. 470. The Supreme Court affirmed the agency's finding that the employee had acted reasonably in attempting the rescue and that his death could be attributed to the risks of his employment. *Id.* at 508, 71 S.Ct. 470. The Court also noted that a reasonable rescue attempt was "an incident of the service, foreseeable, if not foreseen" and therefore arose out of the "zone of special danger" created by the conditions of the employee's job. *Id.* at 507, 71 S.Ct. 470.

Courts applying *O'Leary* have held that injuries resulting from reasonable and foreseeable recreational activities in isolated or dangerous locales arise out of a "zone of special danger" and are therefore compensable under the LHWCA. *See, e.g., O'Keeffe v. Smith, Hinchman & Grylls Assoc., Inc.,* 380 U.S. 359, 363–64, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965) (employee drowned in a weekend boating accident 30 miles from his job site at a defense base in South Korea); *Self v. Hanson,* 305 F.2d 699, 702–03 (9th Cir.1962) (employee was injured during a late-night rendezvous with her supervisor in a parked car that was hit by an out-of-control army weapons carrier in Guam); *Takara v. Hanson,* 369 F.2d 392 (9th Cir.1966) (employee was hit by a truck while hitchhiking back to his campsite after dinner at a local restaurant in Guam); *Pan Am. World Airways, Inc. v. O'Hearne,* 335 F.2d 70, 70–71 (4th Cir. 1964) (death of employee in an after-hours jeep accident in the Bahamas arose out of the "zone of special danger" even though the jeep may have been speeding and the employer may not have authorized the use of its jeep); *Gondeck v. Pan Am. World Airways, Inc.,* 382 U.S. 25, 26–27, 86 S.Ct. 153, 15 L.Ed.2d 21 (1965) (same).

 By contrast, injuries resulting from recreational activities that are nei-

ther reasonable nor foreseeable generally fall outside the "zone of special danger." *See, e.g., O'Keeffe,* 380 U.S. at 362, 85 S.Ct. 1012 (noting that *O'Leary* "drew the line only at cases where an employee has become 'so thoroughly disconnected from the service of his employer that it would be entirely unreasonable to say that injuries suffered by him arose out of and in the course of his employment' ") (quoting *O'Leary,* 340 U.S. at 507, 71 S.Ct. 470). For example, in *Kirkland v. Air America, Inc.,* 23 BRBS 348, 349 (1990), an employee was murdered during a burglary of his home. The employee's wife was implicated in the crime by the two men who confessed, one of whom was believed to be her boyfriend. *Id.* at 349, 351–52. The ALJ denied the widow's claim for benefits and the BRB affirmed, concluding, among other things, that her participation in the murder of her husband "effectively severed any causal relationship which may have existed between the conditions created by his job and his death." *Id.* at 349–50; *see also Gillespie v. Gen. Elec. Co.,* 21 BRBS 56 (1988) (no nexus between the conditions of an employee's job and his death by autoerotic asphyxiation).

■ In this case, the ALJ concluded that Ilaszczat established a sufficient nexus between his injury and his employment under the "zone of special danger" doctrine. The ALJ found that employees residing on Johnston Atoll have limited recreational opportunities and that the military expressly authorizes social clubs on the island. The ALJ also found that the presence of social clubs serving alcohol to employees who experience lengthy periods of isolation on the atoll creates a foreseeable risk that horseplay might take place from time to time. The ALJ

noted that Ilaszczat was injured during a brief "one-sided" scuffle, in which Burum was the aggressor. In addition, Ilaszczat participated in the demonstration believing he would not be hurt, either because Burum would accomplish what he had promised or because Ilaszczat would block the kick.[3] On appeal, the BRB concluded that the ALJ properly applied the "zone of special danger" doctrine.

We conclude that the BRB committed no error of law and properly held that the ALJ's factual findings were supported by substantial evidence. Of particular note is the fact that Johnston Atoll is a small, remote island—only two miles long and one-half mile wide—which offers residents few recreational opportunities. We agree that, under these circumstances, horseplay of the type that occurred here is a foreseeable incident of one's employment on the atoll. *Accord, O'Keeffe,* 380 U.S. at 363, 85 S.Ct. 1012 (recognizing that the decedent "had to seek recreation under exacting and unconventional conditions" in South Korea); *O'Hearne,* 335 F.2d at 71 ("[c]onsidering the distant place of employment, the sparsity of population and limited area of the island, ... the group, including the present decedent, were justified in looking for recreation beyond the confines of their habitat"); *Self,* 305 F.2d at 702 (noting that employees reasonably sought recreation at the location where claimant was injured because "[e]mployees were restricted to a most limited portion of the island [of Guam] which itself provided narrow limits of confinement"). We, like the BRB, conclude that the ALJ's decision was not irrational, contrary to law, or without substantial evidence in the record.

**3.** The ALJ observed that Ilaszczat had consumed several alcoholic drinks that night. The LHWCA precludes compensation for injuries "occasioned solely by the intoxication of the employee." 33 U.S.C. § 903(c). Kalama conceded at trial that the evidence did not support a finding that Ilaszczat's injury was occasioned solely by his intoxication.

## II. Employee Misconduct

 Kalama next argues that Ilaszczat's misconduct and breach of company rules provide an independent basis for denying him disability benefits. Employee misconduct is, in general, not material in compensation law, unless it "takes the form of deviation from the course of employment." 2 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 32.00 (2000). Kalama argues that Ilaszczat's conduct in this case was a "deviation" from the course of his employment. In support of this argument, Kalama relies principally on the Board's decision in *Brooks v. Newport News Shipbuilding and Dry Dock Co.*, 26 BRBS 1 (1992).

In *Brooks*, the claimant injured his lower back while working as a joiner. *Id.* at 2. When he returned to work three days later, the claimant reported his injury to a physician at his employer's clinic and advised the physician that he had injured his back several years earlier. *Id.* The claimant worked intermittently for another three months, after which his employer assigned him lighter work issuing tools. *Id.* Two months later, the employer discharged the claimant on the ground that he had violated the labor contract by failing to disclose his previous back injuries in the employment application. *Id.* The claimant filed a claim for disability benefits seeking, among other things, compensation for several periods of time after the date of his discharge. *Id.* at 2–3.

The employer in *Brooks* argued that the claimant was not entitled to any compensation after the date of his discharge because he lost his job as a result of his own misconduct, not as a result of his injury. *Id.* at 5. The BRB agreed:

> Because claimant's inability to perform the postinjury job at employer's facility on or after [the date of discharge] was due to his own misfea-

sance in violating a company rule, any loss in his wage-earning capacity thereafter is not compensable under the [LHWCA] inasmuch as it was not due to claimant's disability resulting from the work-related incident. Moreover, since claimant was discharged for reasons unrelated to his disability, employer did not have a continuing responsibility to identify new suitable alternate employment, as employer is not a long-term guarantor of claimant's employment.

*Id.* at 6 (citations omitted).

 Kalama argues that Ilaszczat's claim is barred because, like the claimant in *Brooks*, Ilaszczat was discharged as a result of his misconduct. *Brooks*, however, does not establish a rule barring all disability benefits in cases where a claimant is discharged for misconduct. Rather, *Brooks* stands for the much narrower proposition that a claimant's post-injury job, from which he was *later* fired for cause, may satisfy an employer's burden of showing suitable alternative employment. *See, e.g., Brooks v. Dir., Office of Workers' Comp. Programs*, 2 F.3d 64, 65 (4th Cir. 1993) (employer satisfied its burden of showing suitable alternative employment where a suitable alternative job within the company became unavailable to the employee because of his termination); *Mangaliman v. Lockheed Shipbuilding Co.*, 30 BRBS 39, 43 n. 4 (1996) (*Brooks* establishes that a termination for reasons unrelated to a claimant's disability "does not preclude consideration of the job as suitable alternate employment[;]" *Brooks* does "not exempt [an] employer from meeting the normal tests for establishing suitable alternate employment").

*Brooks* is inapplicable here. The claimant in *Brooks* returned to work three days after his injury, worked intermittently for another three months, and was subse-

quently assigned lighter work at the same company for the next two months until he was discharged. *Brooks,* 26 BRBS at 2. By contrast, Ilaszczat *never* worked for Kalama again after he injured his hip. He was *not* performing suitable alternate employment at the time Kalama discharged him. Thus, *Brooks* simply does not apply. *Accord, Newport News Shipbuilding and Dry Dock Co. v. Riley,* 262 F.3d 227, 232 (4th Cir.2001) (*Brooks* did not apply because claimant was not performing suitable alternative employment within the company at the time she was terminated).

The BRB concluded that Kalama failed to satisfy its burden of demonstrating that suitable alternative employment was available to Ilaszczat. Kalama does not contest this conclusion in its petition for review. Instead, Kalama argues it should be excused from satisfying its burden because employees working under Defense Base Act contracts on Johnston Atoll ordinarily earn significantly higher wages than they would in non-DBA projects elsewhere. However, Kalama did not raise this argument before the BRB. Therefore, the argument is waived. *See Duncanson–Harrelson v. Dir., Office of Workers' Comp. Programs,* 644 F.2d 827, 831–32 (9th Cir. 1981).

PETITION FOR REVIEW DENIED.