**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHUGACH MANAGEMENT SERVICES; ZURICH AMERICAN INSURANCE COMPANY,<br><br>*Petitioners*,<br><br>v.<br><br>EDWIN JETNIL; DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAM; U.S. DEPARTMENT OF LABOR,<br><br>*Respondents*. | No. 15-72873<br><br>BRB No. 14-0361<br><br><br>OPINION |

On Petition for Review of an Order of the
Benefits Review Board

Argued and Submitted May 16, 2017
San Francisco, California

Filed July 21, 2017

Before: William C. Canby and Mary H. Murguia, Circuit
Judges, and Cynthia M. Rufe,[*] District Judge.

Opinion by Judge Murguia

---

[*] The Honorable Cynthia M. Rufe, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## SUMMARY**

### Defense Base Act

The panel denied a petition for review of a decision of the United States Department of Labor's Benefits Review Board ("BRB") awarding disability benefits, pursuant to the Defense Base Act, to Edwin Jentil, who was employed by petitioner U.S. government contractor Chugach Management Services when he was injured.

The Defense Base Act is a workers' compensation scheme for civilian employees working outside of the continental United States on military bases or for companies under contract with the U.S. government.

Jentil was a citizen of the Republic of the Marshall Islands, and was injured while on a work assignment for Chugach on the remote Kwajalein Atoll, which houses the U.S. Army Space and Missile Defense Command's Ronald Reagan Ballistic Missile Defense Site.

Under the judicially created "zone of special danger doctrine," employees may be compensated for "injuries resulting from reasonable and foreseeable recreational activities in isolated or dangerous locales." *Kalama Servs., Inc. v. Dir., Office of Workers' Comp. Programs*, 354 F.3d 1085, 1091 (9th Cir. 2004).

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the judicially created zone of special danger doctrine could be applied to local nationals employed in their home country under an employment contract covered by the Longshore and Harbor Workers' Compensation Act, as extended by the Defense Base Act. The panel further held that the administrative law judge and the BRB did not commit legal error by applying the zone of special danger doctrine to Jetnil, who was employed by a Defense Base Act-covered contract in his home country. The panel concluded that substantial evidence supported the ALJ and BRB decision and the award of temporary total disability benefits to Jetnil.

## COUNSEL

Keith L. Flicker (argued) and Timothy A. Pedergnana, Flicker Garelick & Associates LLP, New York, New York, for Petitioners.

Patrick B. Streb (argued), Weltin Streb & Weltin LLP, Oakland, California; Matthew W. Boyle (argued), Attorney; Gary K. Stearman, Counsel for Appellate Litigation; Mark Reinhalter, Counsel for Longshore; Rae Ellen James, Associate Solicitor; M. Patricia Smith, Solicitor of Labor; United States Department of Labor, Washington, D.C.; for Respondents.

**OPINION**

MURGUIA, Circuit Judge:

We are charged with determining, for the first time, whether the judicially created "zone of special danger doctrine" can be applied to local nationals who are employed in their home country under employment contracts covered by the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901–950, as extended by the Defense Base Act ("DBA"), 42 U.S.C. §§ 1651 *et seq*. The DBA is a workers' compensation scheme for civilian employees working outside of the continental United States on military bases or for companies under contract with the U.S. government. Respondent Edwin Jetnil was employed by petitioner and U.S. government contractor Chugach Management Services ("Chugach") when he was injured. Jetnil sought and obtained disability benefits pursuant to the DBA. Chugach and petitioner Zurich American Insurance Company (collectively "Petitioners") argue that the administrative law judge ("ALJ") and the United States Department of Labor's ("DOL") Benefits Review Board ("BRB") committed a legal error by concluding that the zone of special danger doctrine may apply, as a matter of law, to local nationals employed in their home country pursuant to a DBA-controlled contract (we refer to such individuals throughout this opinion as "local nationals"). Petitioners alternatively argue that substantial evidence did not support the ALJ and BRB's decision awarding Jetnil disability benefits. We disagree. The zone of special danger doctrine may apply to local nationals and substantial evidence supports the ALJ and BRB's decision that Jetnil's injury is compensable under the DBA. We therefore deny the petition for review.

## I.  BACKGROUND

Jetnil, born in 1952, was a citizen of the Republic of the Marshall Islands ("RMI").  Jetnil resided on Third Island, an island in the remote Kwajalein Atoll that is approximately 2,400 miles southwest of Honolulu, Hawaii.  Third Island has no telephone service, no mail delivery, no airstrip, and no electricity except that which is provided by portable generators.  The Kwajalein Atoll houses the U.S. Army Space and Missile Defense Command's Ronald Reagan Ballistic Missile Defense Test Site.

From 1980 until the events at issue in this litigation, Jetnil worked for contractors that provided services for the U.S. Army on the Kwajalein Atoll.  As relevant here, in 2009, Chugach hired Jetnil as a painter for approximately $439 per week.  Jetnil usually worked on a relatively large island in the Kwajalein Atoll called Roi Namur, but occasionally worked on Gagan Island.  Gagan Island, also in the Kwajalein Atoll, is uninhabited and houses some communications buildings.  There are no living quarters except for a trailer provided by Chugach.  Gagan Island is accessible only by boat or helicopter and with the permission of Chugach.  When employees work at Gagan Island, Chugach provides food and transportation to the island.

On January 7, 2009, Jetnil traveled to Gagan Island with two coworkers to paint and repair the Gagan Island pier.  Chugach arranged for a boat to transport Jetnil and his coworkers from Roi Namur to Gagan Island.  While on Gagan Island, Jetnil and his coworkers resided in Chugach's trailer, which had three bedrooms, a refrigerator, a living room, a television, and a bathroom.  Jetnil and his coworkers brought rice, bread, chicken, hot dogs, and bacon in an ice box for their four-day assignment on Gagan Island.  In

addition, employees would occasionally fish while on Gagan Island and store fish in the trailer's refrigerator.

Chugach had a policy prohibiting reef fishing during work hours.  At approximately 6:00 p.m., after work hours, on January 9, 2009, Jetnil went reef fishing.  Reef fishing, which involves throwing nets to catch fish in coral reefs, is a common cultural practice of the Marshallese.  The Marshallese typically eat the fish they catch and often share their catch with friends and family.  Though Jetnil apparently was known as a good reef fisher, he slipped and cut his right foot on the coral while fishing.  Despite the cut between his fourth and fifth toes, Jetnil continued to work on Gagan Island through January 10, 2009.

After returning from Gagan Island, Jetnil sought treatment for his cut at the Third Island medical clinic.  Third Island only has a one-room clinic run by the RMI government and staffed with a nurse.  Around January 20 or 21, 2009, Jetnil traveled to Roi Namur and informed a coworker that he was taking the rest of the week off.  On January 26, 2009, Jetnil sought treatment at the Roi Namur Dispensary, which provides basic medical care.  Jetnil's right foot was wrapped, soiled, and foul smelling.  After visiting the Roi Namur nurse, Jetnil was flown by helicopter to Kwajalein Hospital, where he was evaluated for the first time by a doctor.  The doctor found that Jetnil's fourth and fifth toes were black and housed maggots.  The doctor conducted various tests on Jetnil's right leg and diagnosed him with a severe infection and possible gas gangrene.  On January 27, 2009, another doctor amputated Jetnil's right leg below his knee.  About a month after the surgery, Jetnil was released from the hospital.

Jetnil first notified Chugach about the injury and subsequent amputation on February 2, 2009.  On that same

day, Jetnil's supervisors, Robbie Amador and Floyd Corder, visited Jetnil at the hospital and filled out an initial notification form. On February 3, 2009, Jetnil filed his first report of injury with the DOL's Office of Workers' Compensation Program ("OWCP"). Jetnil described the injury and reported the injury as compensable under the DBA. On February 20, 2009, Chugach filed a "Notice of Controversion of Right to Compensation" with the OWCP, stating that it "respectfully controvert[s] [Jetnil's] claim [for disability benefits,] as the injury leading to claimant's present status did not arise within the scope and the course of his employment," so "the claim is not compensable under the DBA."

The case was ultimately referred to an ALJ. The parties conducted some discovery before agreeing to submit the matter for a decision on the record. The record contained stipulated testimony of Jetnil, stipulated testimony of Jetnil's coworkers and supervisors, Jetnil's medical records, Jetnil's wage report, and Jetnil's time sheets. The ALJ issued a decision and order on July 1, 2014, making multiple factual determinations and awarding medical benefits and compensation for total temporary disability benefits to Jetnil, pursuant to the DBA, beginning from January 15, 2009.

Though Jetnil's injury was not directly caused by his employment, the ALJ, relying on *O'Leary v. Brown-Pacific-Maxon, Inc.*, 340 U.S. 504 (1951), determined that the unconventional conditions of Jetnil's employment "placed him in an environment with unique risks, which created a zone of special danger that led to his amputation." Petitioners had argued that Jetnil was not subject to the zone of special danger doctrine because that doctrine applies only to employees sent to work abroad, and Jetnil was a citizen of

RMI, where he was injured.  The ALJ rejected this argument and concluded that "[t]he zone of special danger is not negated because the place of employment is not an overseas locale."  The ALJ then concluded that Jetnil's disability was "temporary" because Jetnil might receive a prosthetic leg and thereby improve his ability to care for himself, and "total" because Jetnil could not return to his usual and customary employment and Petitioners failed to argue that Jetnil could do other suitable alternative employment.  The ALJ therefore ordered Petitioners to (1) pay or reimburse Jetnil for all reasonable and necessary medical expenses, including ongoing treatment; (2) pay "temporary total disability benefits from January 15, 2009, to date based on an average weekly wage of $439.05"; and (3) pay Jetnil's reasonable attorney's fees.

Petitioners filed a notice of appeal with the BRB on July 17, 2014.  Petitioners again argued that the ALJ erred in applying the zone of special danger doctrine.  The Director of OWCP ("Director") filed a response brief in support of Jetnil and recommended that the BRB affirm the ALJ.  The BRB affirmed the ALJ on July 21, 2015.  The BRB rejected Petitioners' argument that "as a matter of law . . . the zone of special danger doctrine may never be applied in cases involving local nationals who are injured while working in their home countries."  The BRB reasoned that the text of the DBA does not distinguish between local and foreign nationals and that the Supreme Court and Congress have not excluded foreign nationals even though both institutions had the opportunity.  Instead, the BRB concluded that "the application of the zone of special danger doctrine" depends on a factual determination; the doctrine "may or may not be applicable to a local national working for a DBA employer in his home country, depending on the specific circumstances presented by the individual case."  In

applying the zone of special danger doctrine to Jetnil, the BRB concluded that substantial evidence supported the ALJ's conclusion that Jetnil's injury arose out of the reasonable and foreseeable risks associated with the obligations and conditions of Jetnil's employment. For that reason, Jetnil was entitled to the awarded benefits.

Petitioners timely petitioned for review on September 16, 2015. 33 U.S.C. § 921(c). We have jurisdiction over the petition, *id.*, and we deny it.[1]

## II. STANDARD OF REVIEW

We review BRB decisions for "errors of law and for adherence to the substantial evidence standard." *Kalama Servs., Inc. v. Dir., Office of Workers' Comp. Programs*, 354 F.3d 1085, 1090 (9th Cir. 2004). The BRB in turn reviews the ALJ's decision for substantial evidence and "may not substitute its views for those of the [ALJ] or engage in a *de novo* review of the evidence." *Id.* (internal quotation marks omitted). The panel and BRB must

---

[1] We grant Chugach's and the Director's motions to take judicial notice of the fact that Jetnil died on May 10, 2015. But contrary to the Director's arguments, Jetnil's death does not moot this case. Although Chugach cannot recoup the payments already made, *see Stevedoring Servs. of Am. Inc. v. Eggert*, 953 F.2d 552, 555–57 (9th Cir. 1992), and is not liable for additional wage compensation, Chugach argued in its appellate briefing and at oral argument that it remains liable to Jetnil for $60,000 pursuant to 33 U.S.C. § 908(c)(15), and that Jetnil's survivors are entitled to recover that money even after Jetnil's death, pursuant to 33 U.S.C. § 908(d)(3). Jetnil's counsel stated at oral argument that Jetnil's family intends to pursue this money if we resolve this case in Jetnil's favor. The Director and Jetnil disagree whether such a claim would be timely, but that disagreement does not render this case moot, as Jetnil's survivors still have a statutory basis to assert their claim, even if it ultimately proves to be time-barred.

therefore accept the ALJ's factual findings unless the factual findings are "contrary to the law, irrational, or unsupported by substantial evidence." *Id.* (internal quotation marks omitted). We must "respect the [BRB's] interpretation of the statute where that interpretation is reasonable and reflects the policy underlying the statute." *Keenan v. Dir. for Benefits Review Bd.*, 392 F.3d 1041, 1044 (9th Cir. 2004) (internal quotation marks omitted); *see also Battelle Mem'l Inst. v. DiCecca*, 792 F.3d 214, 221 (1st Cir. 2015) (explaining that the BRB's rational application of the zone of special danger test "is treated as far as possible as a finding of fact, for which a reviewing court considers only whether the agency had a substantial basis in the record" (citing *O'Leary*, 340 U.S. at 507–09)).

## III. DISCUSSION

### A. Legal Framework of the DBA

Congress enacted the DBA to provide workers' compensation coverage for civilian employees working outside the continental United States on U.S. military bases or under a contract with the U.S. government. 42 U.S.C. § 1651(a) (stating that "the provisions of the [LHWCA] . . . shall apply in respect to the injury or death of any employee engaged in any employment" described in §§ 1651(a)(1)–(6)); *Kalama*, 354 F.3d at 1090 ("Congress passed the Defense Base Act in order to provide workers' compensation coverage for certain classes of employees working outside the continental United States."). The LHWCA provides compensation for injury or death "arising out of and in the course of employment." 33 U.S.C. § 902(2). In *O'Leary*, the Supreme Court created the zone of special danger test to determine whether an injury arises out of and in the course of employment. 340 U.S. at 506–07. The Court explained that a causal relationship between the nature of the

claimant's employment and his injury is not necessary; instead, "[a]ll that is required is that the obligations or conditions of employment create the zone of special danger out of which the injury arose." *Id.* (internal quotation marks omitted).

Under the zone of special danger doctrine, employees may be compensated for "injuries resulting from reasonable and foreseeable recreational activities in isolated or dangerous locales." *Kalama*, 354 F.3d at 1091. There are limits to the zone of special danger doctrine. Some of an employee's activities "might go so far from his employment and become so thoroughly disconnected from the service of his employer that it would be entirely unreasonable to say that injuries suffered by him arose out of and in the course of his employment." *O'Leary*, 340 U.S. at 507 (internal quotation marks omitted). In other words, "injuries resulting from recreational activities that are neither reasonable nor foreseeable generally fall outside the 'zone of special danger.'" *Kalama*, 354 F.3d at 1091–92.

## B. The Zone of Special Danger Doctrine and Local Nationals

The major legal issue on appeal, which is a question of first impression, is whether the zone of special danger doctrine can apply to local nationals, such as Jetnil, who are employed on a DBA-covered contract in their home country. Petitioners argue that it cannot. According to Petitioners, the ALJ and BRB committed a legal error by applying the zone of special danger doctrine to Jetnil, a citizen of RMI who was injured while working in RMI. Jetnil and the Director disagree and argue that the ALJ and BRB correctly concluded that the zone of special danger doctrine may, under certain circumstances, cover local nationals working

in their home countries. Jetnil and the Director have the better of the two arguments.

First, the plain language of the DBA does not distinguish between employees sent abroad from their home country and local nationals. Title 42 U.S.C. § 1651(a) states that the LHWCA "shall apply in respect to the injury or death of *any* employee engaged in *any* employment" identified in §§ 1651(a)(1)–(6) (emphasis added). And the DBA does not require working in a foreign nation, only that the employment be at a military base acquired after 1940 from any foreign government, 42 U.S.C. § 1651(a)(1), or "outside the continental United States," *id.* §§ 1651(a)(2)–(6).

Second, Congress implicitly endorsed application of the zone of special danger doctrine to local nationals. The Supreme Court first articulated the zone of special danger doctrine in *O'Leary* in 1951. In 1953, Congress acted to exclude local nationals from DBA coverage. Pub. L. 83-100, 67 Stat. 135 (June 30, 1953). But in 1958, Congress reinstated DBA coverage for local nationals. Pub. L. 85-608, 72 Stat. 538 (August 8, 1958). Under traditional statutory interpretation principles, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). Since Congress expanded DBA coverage in 1958 to local nationals, after the Supreme Court had announced the zone of special danger doctrine, we presume that Congress intended to permit application of the zone of special danger doctrine to local nationals. *See id.*

Third, *O'Leary* and its progeny almost without exception do not distinguish between employees sent abroad from their home country and local nationals when determining whether an injury arose out of the conditions of one's employment.

*O'Leary* never mentions the domicile of the claimant in that case. 340 U.S. at 504–10. Neither does *Kalama*, 354 F.3d at 1085–94, *Ford Aerospace & Commc'ns Corp. v. Boling*, 684 F.2d 640, 640–43 (9th Cir. 1982), or *Self v. Hanson*, 305 F.2d 699, 699–703 (9th Cir. 1962). Petitioners quote from several cases in support of their argument that the zone of special danger doctrine was extended "because of the subjective predicaments of the typical overseas DBA employee." But Petitioners are unable to identify a single Ninth Circuit or Supreme Court case that has held that the DBA applies only to employees sent from their home country to work abroad.[2]

Fourth, almost all of the justifications for the zone of special danger doctrine apply with equal force to local nationals working in remote areas as to employees working away from their home country. The zone of special danger doctrine is justified in part because the employment takes the

---

[2] Language in two out-of-circuit cases may seem to support Petitioners' claim. For example, the Fifth and First circuits have suggested that the zone of special danger doctrine applies only to employees who were sent abroad from the United States. In *O'Keeffe v. Pan Am. World Airways, Inc.*, 338 F.2d 319, 325 (5th Cir. 1964), the court stated in passing that a certain island lacked "most of the social and recreational facilities usually available to American employees." Similarly, the First Circuit recently stated, in explaining the scope of the zone of special danger doctrine, that the risks must simply be foreseeable and "occasioned by or associated with the employment abroad." *Battelle Mem'l Inst.*, 792 F.3d at 220. The *Battelle* court also explained that the doctrine "covers risks peculiar to the foreign location or risks of greater magnitude than those encountered domestically." *Id.* But *Battelle* did not squarely address the issue in the case at bar: whether a local national can benefit from the zone of special danger doctrine. Thus, even out-of-circuit cases that appear to address the claimant's status as an employee working abroad do so in dicta and without explicitly identifying the domicile of the claimant.

employees to remote, uninhabited, or generally inconvenient places. *See, e.g.*, *Kalama*, 354 F.3d at 1092 (describing Johnston Atoll as a "small, remote island . . . which offers residents few recreational opportunities"); *Ford*, 684 F.2d at 642 (describing the need to live in barracks because of the remote location of Thule, Greenland); *O'Keeffe*, 338 F.2d at 322 (explaining that "[e]mployees working under the Defense Bases Act, far away from their families and friends, in remote places where there are severely limited recreational and social activities, are in different circumstances from employees working at home"); *Self*, 305 F.2d at 703 (noting "Guam's remoteness from other civilization - particularly Sausalito (or Palo Alto)"). As this case demonstrates, the conditions of employment for local nationals may very well subject them to remote, uninhabited, and inconvenient locales, even in their home country.

Fifth, concluding that the zone of special danger doctrine does not apply to local nationals injured in their home country would lead to irrational results and contradictory case law. Multiple DBA cases involve individuals injured on American soil, though not the continental United States. For example, *O'Leary*, 340 U.S. at 505, and *Self*, 305 F.2d at 700, involved individuals injured in the U.S. territory of Guam. If these individuals were domiciled in the United States, then under Petitioners' proposed rule, they could not be covered by the zone of special danger doctrine.

Petitioners raise several objections. Most notably, Petitioners argue that applying the zone of special danger doctrine to local nationals will result "in the imposition of a strict premise liability standard, resulting in twenty-four hour-a-day, seven-day-a-week coverage." Petitioners identify a series of absurd results, including that local nationals "sitting in their living rooms watching television,

walking to a religious function, or gathered in a square for protest, would be found to be engaged in an activity within the course of employment."

But as the Director points out, the application of the zone of special danger doctrine will necessarily differ for local nationals employed in their home country than for an employee sent from his or her home country to work abroad. The Director explains that "if Jetnil had been hurt fishing on a day off on his home island, rather than between shifts during a four-day overnight work assignment on an uninhabited island with restricted access, [Petitioners] would have a strong argument against application of the zone of special danger doctrine." Every application of the zone of special danger doctrine is necessarily unique to the factual circumstances of that case. *See Kalama*, 354 F.3d at 1091–92 (contrasting cases that have applied the zone of special danger doctrine with cases that have not applied the zone of special danger doctrine based on different factual circumstances). Applying the zone of special danger doctrine to Jetnil in this case simply does not promise the absurd results Petitioners describe.

Petitioners also argue that no court has applied the zone of special danger doctrine to local nationals. As near as we can tell, this statement is true. But no court has denied benefits to local nationals by holding that the zone of special danger doctrine cannot, by law, apply to them. This issue simply has not been decided by any court.

Petitioners also argue that "[a]ll previous applications of the zone of special danger doctrine were made with express consideration toward the 'overseas' nature of the employee's employment." Petitioners' statement is simply untrue. As described above, all courts applying the zone of special danger doctrine justify it in part because the employment

takes the employees to remote, uninhabited, or generally inconvenient places. These concerns over the remote and inconvenient nature of a locale can just as easily apply to local nationals employed in their homeland as it can to employees sent abroad from their home country.

Finally, Petitioners argue that extending the zone of special danger doctrine to local nationals would "run afoul of the overseas' workers' compensation scheme conceived by Congress through the DBA, [Federal Employees Compensation Act ("FECA")], and [War Hazards Compensation Act ("WHCA")]." In particular, Petitioners point out that the WHCA, which provides compensation for civilian employees injured or killed by war-risk hazards, specifically excludes individuals "whose residence is at or in the vicinity of the place of his employment." 42 U.S.C. § 1701(d). Petitioners argue that the extension of the zone of special danger doctrine to local nationals would "render meaningless" 42 U.S.C. § 1701(d). We disagree. The WHCA is a wholly different statute that provides compensation benefits when injury or death results from the hostile act of an enemy force. 42 U.S.C. § 1701(a). Moreover, the fact that Congress arguably excluded local nationals from the WHCA but did not include that same exclusion in the DBA suggests that Congress intended to permit DBA coverage for local nationals. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (internal quotation marks omitted)).

For all of these reasons, we hold that the zone of special danger doctrine can apply to local nationals working in their

home countries. The ALJ and BRB did not commit legal error by applying the zone of special danger doctrine to Jetnil. We therefore proceed to analyze whether substantial evidence supports the ALJ and BRB's decision that Jetnil is entitled to disability benefits because his injury arose out of the zone of special danger associated with his employment.

## C. Substantial Evidence

We review BRB decisions for "adherence to the substantial evidence standard." *Kalama*, 354 F.3d at 1090. The BRB in turn reviews the ALJ's decision for substantial evidence and "may not substitute its views for those of the [ALJ] or engage in a *de novo* review of the evidence." *Id.* (internal quotation marks omitted). The BRB must accept the ALJ's factual findings unless the factual findings are "contrary to the law, irrational, or unsupported by substantial evidence." *Id.* (internal quotation marks omitted). We conclude that substantial evidence supports the ALJ and BRB's determination that Jetnil's injury was compensable because it arose out of the conditions of his employment and occurred while he was engaged in a reasonable and foreseeable activity.

The ALJ's factual determinations are largely undisputed. Jetnil would not have been on Gagan Island but for his employment. Gagan Island is remote, accessible only by boat, and accessible only with the permission of Chugach. Jetnil traveled to Gagan Island on a boat secured by Chugach, and Chugach provided housing and food for Jetnil during his four-day stay on the island. Moreover, Jetnil was injured while engaging in the traditional Marshallese activity of reef fishing. Given that the activity is common in RMI, it was foreseeable and reasonable that Jetnil would reef fish during his time off. *See id.* at 1092 (reasoning that since Johnston Atoll is a small, remote island with few recreational

activities, "horseplay of the type that occurred here is a foreseeable incident of one's employment on the atoll").

The circumstances under which other courts have applied the zone of special danger doctrine are similar to the circumstances of this case. In *O'Leary*, the claimant was working in Guam when he jumped into a dangerous river channel that abutted his employer's recreational center in an attempt to rescue a man stuck in the channel. 340 U.S. at 505. The claimant drowned, and his mother filed a claim for death benefits. *Id.* The Supreme Court applied the zone of special danger doctrine, concluding that his "reasonable rescue attempt . . . may be one of the risks of the employment, an incident of the service, foreseeable, if not foreseen, and so covered by the [LHWCA]." *Id.* at 507 (internal quotation marks omitted). Many other courts have concluded that "injuries resulting from reasonable and foreseeable recreational activities in isolated or dangerous locales arise out of a 'zone of special danger' and are therefore compensable under the LHWCA." *Kalama*, 354 F.3d at 1091; *see also O'Keeffe v. Smith, Hinchman & Grylls Assocs., Inc.,* 380 U.S. 359, 363–64 (1965) (applying the zone of special danger doctrine to a petitioner who drowned in a weekend boating accident outside of his work site in South Korea); *Takara v. Hanson*, 369 F.2d 392 (9th Cir. 1966) (applying the zone of special danger doctrine to a petitioner who was struck by a truck while hitchhiking after dinner at a local restaurant in Guam); *Pan Am. World Airways, Inc. v. O'Hearne,* 335 F.2d 70, 70–71 (4th Cir. 1964) (applying the zone of special danger doctrine to employee who died in an after-hours jeep accident in the Bahamas); *Self*, 305 F.2d at 702–03 (applying the zone of special danger doctrine to petitioner who was injured during a late-night rendezvous with her supervisor in a parked car that was hit by another car in Guam). The *Kalama* court

helpfully contrasted these cases with cases in which the court declined to apply the zone of special danger doctrine. *Kalama*, 354 F.3d at 1091–92; *see, e.g.*, *Kirkland v. Air Am., Inc.,* 23 BRBS 348, 349, 1990 WL 284045 at *2 (1990) (refusing to apply the zone of special danger doctrine because "claimant's participation in the murder of her husband effectively severed any causal relationship which may have existed between the conditions created by his job and his death"); *Gillespie v. Gen. Elec. Co.*, 21 BRBS 56, 1988 WL 232796, at *1–*3 (1988) (reversing ALJ's decision that petitioner's death by autoerotic asphyxiation arose out of the zone of special danger because there was no reasonable connection between the conditions of petitioner's employment and his death). The situation we are presented with in this case clearly resembles cases like *O'Leary*, *Kalama*, *Self*, and *Takara*, not cases like *Kirkland* and *Gillespie*.

Given the level of deference we must apply to the BRB and the ALJ, we cannot conclude that the BRB and ALJ decision was "contrary to the law, irrational, or unsupported by substantial evidence." *Kalama*, 354 F.3d at 1090. We hold that substantial evidence supports the ALJ and BRB decision and the award of temporary total disability benefits.

## IV. CONCLUSION

The zone of special danger doctrine may apply to local nationals. Here, substantial evidence supports the ALJ and BRB's conclusion that Jetnil's injury occurred within a zone of special danger and is compensable under the DBA. We therefore **DENY** the petition for review.