**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CLINTON T. ELDRIDGE,
*Petitioner-Appellant,*

v.

CATRICIA HOWARD; PATRICIA
K. CUSHWA, Acting Chairman of the
U.S. Parole Commission,
*Respondents-Appellees.*

No. 21-15616

D.C. No.
4:21-cv-00081-
RCC-LAB

OPINION

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, District Judge, Presiding

Argued and Submitted December 5, 2022
Phoenix, Arizona

Filed June 2, 2023

Before: Kim McLane Wardlaw and Patrick J. Bumatay,
Circuit Judges, and Karen E. Schreier,[*] District Judge.

Opinion by Judge Schreier;
Dissent by Judge Bumatay

---

[*] The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel reversed the district court's judgment dismissing Clinton Eldridge's amended habeas corpus petition, which the district court construed as brought under 28 U.S.C. § 2241, and remanded to the district court to decide the petition on the merits.

Eldridge filed the instant habeas petition in the District Court for the District of Columbia in February 2020. In the amended petition, Eldridge challenges, among other things, the United States Parole Commission's 2019 decision to issue a three-year "set-off," the time he must wait until his next parole hearing. The District Court for the District of Columbia transferred the case to the District of Arizona, where Eldridge was incarcerated. That court dismissed Eldridge's petition as an impermissible second or successive petition under the Antiterrorism and Effective Death Penalty Act, and denied Eldridge's motion to reconsider. Relying on the abuse of the writ doctrine, the district court concluded that Eldridge's claims were substantially similar to the claims he raised in at least two other § 2241 petitions.

The panel held that Eldridge need not obtain a certificate of appealability (COA) to appeal the denial of the instant petition because Congress did not define or include the District of Columbia Superior Court as a "State court" in 28 U.S.C. § 2253(c), where it had expressly done so in that and other statutes. The panel held that § 2253(c)(1)(A)'s

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

language, "in which the detention complained of arises out of process issued by a State court," does not include the District of Columbia Superior Court. Prisoners whose detention arises out of process issued by a District of Columbia court are not required to obtain a COA to appeal the denial of habeas relief; thus, the COA jurisdictional requirement does not pose a barrier to Eldridge's appeal.

The panel further held that the district court erred in dismissing the petition as an abuse of the writ when Eldridge could not have possibly raised the same claims in prior petitions. Looking to the substance of Eldridge's claim—that the Parole Commission acted arbitrarily and capriciously in 2019 when it issued a three-year set-off—the panel concluded that Eldridge did not have a fair opportunity to raise this claim in 2016 or 2018 because the alleged violation occurred only after the denial of his 2016 and 2018 habeas petitions. Additionally, the district court did not address the merits of the set-off issues in its decision denying Eldridge's habeas petition in 2016, even though Eldridge raised the issue. Thus, because no court has addressed Eldridge's three-year set-off claims regarding his 2016 parole denial, he did not abuse the writ by raising the 2019 denial issue in his instant habeas petition.

Judge Bumatay dissented. He wrote that this court should have stuck with the consensus, embraced by the five circuit courts to consider the question, that the D.C. Superior Court is a "State court" under habeas law and prisoners challenging detention arising from a D.C. Superior Court conviction must obtain a COA before appealing. He wrote that, all told, textual and contextual evidence supports that overwhelming consensus. He wrote that the panel should therefore have required Eldridge to obtain a COA before exercising jurisdiction over this appeal, and that he would

conclude that Eldridge does not deserve one. He wrote that in scheduling Eldridge's 2010 and 2013 parole rehearings, the Parole Commission's erroneous use of the longer (three-year) 2000 guidelines set-off period, rather than the shorter (one-year) 1972 guidelines set-off period, did not result in any increase in Eldridge's incarceration, and that his ex post facto constitutional challenge to those denials therefore fails. He wrote that Eldridge's claims related to his 2016 and 2019 rehearings, for which the Commission plainly used the appropriate 1972 guidelines, fare no better. He concluded that, even if the Commission had applied an ex post facto law, which it did not, Eldridge still can't succeed because there was no basis to conclude that the longer set-offs under the new law would extend his actual period of confinement.

## COUNSEL

Keith J. Hilzendeger (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender, District of Arizona; Federal Public Defender's Office; Phoenix, Arizona; for Petitioner-Appellant.

Timothy R. Cahill (argued) and Suzanne Grealy Curt, Assistant United States Attorneys; Office of the United States Attorney; Washington, D.C.; Melissa Marcus Kroeger, Assistant United States Attorney; Christina M. Cabanillas, Deputy Appellate Chief; Gary M. Restaino, United States Attorney, District of Arizona; Office of the United States Attorney; Tucson, Arizona; for Respondents-Appellees.

## OPINION

SCHREIER, District Judge:

The issue here is whether the District of Columbia Superior Court counts as a "State court," for purposes of 28 U.S.C. § 2253(c)(1), when the statute is silent on the matter. We conclude, for purposes of 28 U.S.C. § 2253(c)(1), that a District of Columbia Superior Court is not a "State court," and thus petitioner Clinton Eldridge need not obtain a certificate of appealability (COA) to appeal the district court's denial of his most recent habeas petition. We further hold that because the district court erred in dismissing Eldridge's petition, the case is reversed and remanded to the district court to decide Eldridge's petition on its merits.

### I.

Eldridge pleaded guilty in 1984 to nine counts, ranging from burglary to rape. *Eldridge v. United States*, 618 A.2d 690, 694 (D.C. 1992). The District of Columbia Superior Court sentenced him to prison for 40 to 120 years. *Id*.[1] Eldridge first became eligible for parole in 2010. The United States Parole Commission (Commission) denied Eldridge parole in 2010, 2013, 2016, 2018, and 2019.[2]

---

[1] The District of Columbia Court of Appeals vacated one of his convictions, but the Superior Court imposed the same aggregate sentence after remand. *See Eldridge v. Davis*, No. 10-1440, 2010 WL 3394708, at *1 (D.D.C. Aug. 25, 2010).

[2] The District of Columbia Board of Parole made parole decisions until 1997, when Congress "abolished the D.C. Board of Parole and directed the U.S. Parole Commission to conduct parole hearings for D.C. Code offenders." *See Daniel v. Fulwood et al.*, 766 F.3d 57, 59 (D.C. Cir. 2014).

In March 2016, Eldridge filed a habeas petition under 28 U.S.C. § 2241 challenging his 2010, 2013, and 2016 parole denials.  He alleged, among other things, that the Commission improperly used guidelines it had issued in 2000, which were not in place at the time he committed his offense, when deciding whether to release him and how much time he must wait until his next parole hearing (also known as a "set-off" date).  The United States District Court for the District of Colorado denied relief but did not explicitly address Eldridge's set-off arguments.  *See Eldridge v. Oliver*, 16-00690, 2017 WL 2812824, at \*1–9 (D. Colo. June 29, 2017).  The Tenth Circuit denied Eldridge's request for a COA and dismissed his appeal.  *See Eldridge v. Oliver*, 710 F. App'x 348, 349 (10th Cir. 2018).

In April 2018, Eldridge filed another 28 U.S.C. § 2241 petition challenging the denial of parole in 2010 and 2013.  He also alleged that he was improperly denied access to a sex offender treatment program.  Further, he argued that in 2016 the Commission improperly issued a three-year set-off (the presumptive time under the Commission's 2000 guidelines), rather than a one-year set-off (the presumptive time under the District of Columbia Parole Board's 1972 guidelines, which were in place at the time of his offense). [3] The District of Colorado ultimately dismissed Eldridge's 2018 habeas petition as "malicious" and "repetitive" without deciding the merits of his claims.  *See Eldridge v. U.S. Parole Comm'n*, 18-00797, 2018 WL 10426189, at \*1–2 (D. Colo. May 8, 2018).  Once again, the Tenth Circuit denied Eldridge's request for a COA and dismissed his appeal.  *See*

---

[3] Eldridge's April 2018 petition could not challenge his 2018 parole denial because the Commission did not deny his parole request until November 2018.

*Eldridge v. U.S. Parole Comm'n*, 737 F. App'x 901, 902 (10th Cir. 2018).

In February 2020, Eldridge filed the instant habeas petition in the District Court for the District of Columbia. After a district court judge ordered him to do so, Eldridge filed an amended petition. Although he styled his petition as a writ of habeas corpus under D.C. Code § 16-1091(b), the district court construed his petition under 28 U.S.C. § 2241. *See Eldridge v. Blanckensee*, 20-1009, 2021 WL 325959, at *3 (D.D.C. Feb. 1, 2021). In his amended petition, Eldridge challenges, among other things, the Commission's 2019 decision to issue a three-year set-off. In support, he points to the Commission's 2018 decision issuing a one-year set-off. He correctly notes that the Commission justified both its 2018 and 2019 set-off decisions for similar reasons: that he is an untreated sex offender and needs to participate in a sex offender treatment program.

The District Court for the District of Columbia transferred the case to the District of Arizona, the district in which Eldridge was incarcerated, and flagged that Eldridge's claims appeared "substantially similar" to claims he had made in his 2016 and 2018 petitions. *Id.* at *2 n.2, 4–5. The district court for the District of Arizona dismissed Eldridge's petition as an impermissible second or successive petition under the Antiterrorism and Effective Death Penalty Act (AEDPA), citing to 28 U.S.C. §§ 2244(a) and 2244(b). *Eldridge v. Blanckensee*, 21-00081, 2021 U.S. Dist. LEXIS 36254, at *4 (D. Ariz. Feb. 24, 2021).

Eldridge moved the District of Arizona court to reconsider its dismissal, arguing that the court improperly dismissed the case "without any notice." Eldridge contends that his new petition challenges the Commission's 2019

decision to issue a three-year set-off, which he "could not [have] foresee[n]" when he filed his earlier habeas petitions. The District of Arizona denied Eldridge's motion to reconsider. *See Eldridge v. Blanckensee*, No. CV 21-00081-TUC-RCC (LAB), ECF No. 29 at *5 (D. Ariz. Mar. 18, 2021). Relying on the abuse of the writ doctrine, it concluded that Eldridge's claims were "substantially similar to the claims [he] raised in at least two other § 2241 petitions." *See id*.

This appeal followed. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a), and we reverse and remand.

## II.

We first must determine whether 28 U.S.C. § 2253(c)(1) requires Eldridge to obtain a COA. If a COA is required in this case, then it is a jurisdictional requirement that cannot be waived, and we must decide whether to issue one. *See Gonzalez v. Thaler*, 565 U.S. 134, 142 (2012) (noting that 28 U.S.C. § 2253(c)(1) is jurisdictional); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). Absent a COA requirement, however, we have jurisdiction to decide whether the district court erred in dismissing Eldridge's instant petition. *See, e.g.*, *Harbison v. Bell*, 556 U.S. 180, 183–84 (2009) (concluding that a COA was not required and thereafter deciding the issue raised on appeal); *Harrison v. Ollison*, 519 F.3d 952, 958 (9th Cir. 2008) ("In the absence of a statutory COA requirement for federal prisoners bringing legitimate § 2241 petitions, we cannot require one as a condition for our exercise of jurisdiction.").

Section 2253(c)(1) provides:

> Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from--
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a *State* court; or
>
> (B) the final order in a proceeding under section 2255.

(emphasis added).

We agree with both parties that § 2253(c)(1)(B) does not apply because Eldridge properly brought his habeas petition under 28 U.S.C. § 2241. *See Herndon v. U.S. Parole Comm'n*, 961 F. Supp. 2d 138, 141 (D.D.C. 2013) (describing § 2241 as the "exclusive federal avenue available to a District of Columbia prisoner challenging the manner of execution of a sentence, rather than the sentence itself" (cleaned up)). Thus, the issue is whether § 2253(c)(1)(A)'s "State Court" requirement applies to habeas corpus proceedings, such as Eldridge's, which challenge a detention that arose out of a process issued by the District of Columbia Superior Court.[4]

---

[4] Both parties assume that Eldridge's detention "arises out of process issued by" the District of Columbia Superior Court, and both cite *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc), *overruled on other grounds by Swarthout v. Cooke*, 562 U.S. 216 (2011), in support of their conclusion. Because the parties do not brief the issue, we assume, without deciding, the same.

We begin with the text of § 2253(c)(1)(A).  *See Ross v. Blake*, 578 U.S. 632, 638 (2016).  Here, the text requires a COA for an appeal from a final order in a habeas proceeding "in which the detention complained of arises out of process issued by a State court[.]"  28 U.S.C. § 2253(c)(1)(A).  None of AEDPA's habeas corpus amendments define "State court."  *See generally* 28 U.S.C. §§ 2241–2255.  Congress also does not provide a broadly applicable definition of "State" in the Dictionary Act.  *See* 1 U.S.C. §§ 1–8.

Without a definition, we must look to the ordinary meaning of the term "State court" and "state."  *See, e.g.*, *Wooden v. United States*, 142 S. Ct. 1063, 1069 (2022) (looking to the ordinary meaning of the word "occasion"); *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020) (looking to the ordinary meaning of the language used in Title VII at the time the statute was enacted). The ordinary meaning of the word "state" does not—and did not at the time § 2254 was enacted—include the District of Columbia. *See, e.g.*, Zachary B. Wolf, *Why DC Should (and Should Not) Be the 51st State*, CNN (June 26, 2020, 8:09 PM)[5]; Tessa Berenson, *Here's Why Washington D.C. Isn't a State*, Time, (Apr. 15, 2016, 1:57 PM)[6].  The Supreme Court has recognized that "[t]he District of Columbia is constitutionally distinct from the States[.]"  *Palmore v. United States*, 411 U.S. 389, 395 (1973).  And the Federal Rules of Criminal Procedure expressly define the term "State" to include non-state entities such as the District of Columbia, Fed. R. Crim. P. 1(b)(9), suggesting that without

[5] https://www.cnn.com/2020/06/26/politics/dc-statehood-101 (last visited May 23, 2023).

[6] https://time.com/4296175/washington-dc-statehood-history/ (last visited May 23, 2023).

this express definition, the term "state" would not include the District of Columbia.  *See Palmore*, 411 U.S. at 395.

Congress's use of the word "state," in Title 28, the same Title to which     § 2253 belongs, confirms this ordinary meaning: when Congress wishes to treat the District of Columbia as a state in Title 28, it expressly says so.[7]  *See* 28 U.S.C. § 1257 (expressly defining "highest court of a State" to include the District of Columbia Court of Appeals, but not defining "statute of any State" to include District of Columbia statutes for purposes of Supreme Court jurisdiction); 28 U.S.C. § 1332(e) (expressly defining "States" to include, among other things, the District of Columbia for purposes of diversity jurisdiction); 28 U.S.C § 1451(1) (expressly defining "State court" to include the Superior Court of the District of Columbia for purposes of removal jurisdiction).

Congress has defined "state" to include the District of Columbia in other contexts too.  *See, e.g.*, 34 U.S.C. § 20142(f) (rules for closed circuit televising of court proceedings for crime victims); 42 U.S.C. § 6802(6) (electric utility rate design initiatives); 10 U.S.C. § 1045(e)(1) (voluntary withholding of state income tax from retired or retainer pay for current and past members of

---

[7] The dissent acknowledges that "absent strong textual reasons to do otherwise, we ought to embrace the ordinary meaning of a term." However, the dissent concludes that here, we should not rely on the ordinary understanding "that D.C. is not a 'State'" once we take the term "State court" in the context of the statute as a whole.  The dissent ignores the fact that before reaching our conclusion, we consider Congress's use of the word "state" in Title 28 and that we apply the relevant canons of construction.  Both of these contextual factors support our determination that the ordinary use of the term "state" is appropriately used here.

military); 12 U.S.C. § 4001(21) (expedited funds availability in banking); 5 U.S.C.

§ 5707a(f)(3) (federal employee travel expense requirements and procedures). By specifying that the word "state" includes the District of Columbia in certain circumstances within these statutes, Congress is acknowledging that the ordinary definition of the word "state" does not include the District of Columbia.

The Supreme Court's decision in *Palmore* confirms this conclusion. In *Palmore*, the Court interpreted whether 28 U.S.C. § 1257 gave the United States Supreme Court appellate jurisdiction. *See* 411 U.S. at 394. There, Palmore was convicted in the District of Columbia Superior Court of carrying an unregistered pistol after having been convicted of a felony, which violated the District of Columbia Code. *See id.* at 391. Palmore appealed his conviction to the District of Columbia Court of Appeals, arguing that the provision of the District of Columbia Code establishing the Superior Court violated the Constitution because only an Article III court could constitutionally try him for a felony prosecution under the District of Columbia Code. *See id.* at 392–93. The District of Columbia Court of Appeals rejected his argument. *See id.* at 393.

When Palmore sought review by the Supreme Court, he argued that the Supreme Court had jurisdiction under § 1257(2) because the statute he challenged constituted a "statute of any state." *See Palmore*, 411 U.S. at 394–95. The Supreme Court rejected his argument, noting that even though Congress "plainly provided [in the text of § 1257] that the District of Columbia Court of Appeals should be treated as the 'highest court of a state[,]'" Congress did not provide that the phrase "'statute of any state'" included the

District of Columbia Code. *See id.* at 395. The Court recognized that "[a] reference to 'state statutes' would ordinarily not include provisions of the District of Columbia Code," because "[t]he District of Columbia is constitutionally distinct from the States." **8** *See id.* The Supreme Court emphasized that Congress "legislated with care, and that had Congress intended to equate the District Code and state statutes for the purposes of [§] 1257, it would have done so expressly, and not left the matter to mere implication." *Id.*

Here, we assume Congress "legislated with care" when it did not expressly include District of Columbia courts as state courts in 28 U.S.C. § 2253(c). Just as the Supreme Court in *Palmore* determined that Congress would have expressly provided that the District of Columbia Code equated to a state statute if it intended such result, so too do we when interpreting the phrase "process issued by a State court." 28 U.S.C. § 2253(c); *see Palmore*, 411 U.S. at 395. If Congress meant for "State court" to include the District of Columbia Superior Court, it could have easily said so. *See, e.g.*, 28 U.S.C § 1451(1) (defining "State court" to include the Superior Court of the District of Columbia for purposes of removal jurisdiction). Congress did not. A reference to a state court ordinarily does not include a District of Columbia court, and thus we must follow Congress's express words when interpreting 28 U.S.C. § 2253.

We also observe *Palmore's* warning that "[j]urisdictional statutes are to be construed 'with precision

---

8 The dissent suggests that we look to the "legal (rather than a literal) meaning" of "State court" here. But *Palmore* itself illustrates that the Supreme Court has not distinguished between a "literal meaning" and "legal meaning" of the term "state."

and with fidelity to the terms by which Congress has expressed its wishes[.]'" *Palmore*, 411 U.S. at 396 (quoting *Cheng Fan Kwok v. INS*, 392 U.S. 206, 212 (1968)). The Supreme Court has repeatedly instructed courts to exercise caution when declaring statutory provisions jurisdictional, and to do so only if a statute clearly states it is jurisdictional. *See, e.g.*, *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1849 (2019); *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013); *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). Section 2253(c)(1) is a jurisdictional requirement. *See Gonzalez*, 565 U.S. at 142; *Miller-El*, 537 U.S. at 336. Therefore, we must exercise caution and not extend 28 U.S.C. § 2253(c)(1)'s text beyond its ordinary meaning to include the District of Columbia Superior Court. To do otherwise would limit Congress's conferral of jurisdiction without a clear textual basis, a move that the Supreme Court has repeatedly cautioned against doing.

Appellees and our unpublished opinion in *Johnson v. Clay*, 539 F. App'x 748, 748 (9th Cir. 2013), rely heavily on our sister circuit's decision in *Madley v. U.S. Parole Comm'n*, 278 F.3d 1306 (D.C. Cir. 2002).[9] *Madley* concluded that the District of Columbia Superior Court is a state court for purposes of 28 U.S.C. § 2253(c).[10] 278 F.3d

---

[9] Although the dissent asserts that "our court treated it as settled that" the District of Columbia qualifies as a "State court" for purposes of 28 U.S.C. § 2253(c)(1)(A), it also acknowledges that "we did so in a non-precedential memorandum disposition and another panel of this court may disagree with that conclusion." The dissent thus concedes that this question, which has never been decided in a precedential disposition in our circuit, is far from "settled."

[10] We also recognize that several of our sister circuits have followed *Madley*. *See Sanchez-Rengifo v. Caraway*, 798 F.3d 532, 535 (7th Cir. 2015); *Eldridge v. Berkebile*, 791 F.3d 1239, 1244 (10th Cir. 2015);

at 1310. In *Madley*, the court relied on its prior precedent that interpreted a previous version of § 2253(c). *See id.* at 1308–09. It noted that before AEDPA was enacted, § 2253(c) required a certificate of "probable cause" instead of a COA. *See id.* at 1308. The relevant language of the previous version was the same:

> An appeal may not be taken to the court of appeals from the final order in a habeas corpus proceeding where the *detention complained of arises out of process issued by a State court*, unless the justice or judge who rendered the order or a circuit justice or judge issues a certificate of probable cause.

*Id.* (quoting Pub. L. No. 773, § 2253, 62 Stat. 869, 967 (1948) (emphasis added)). In 1986, before the passage of AEDPA, the Court of Appeals for the District of Columbia Circuit concluded that "District of Columbia prisoners are 'state' prisoners for purposes of [the probable cause] requirement." *Garris v. Lindsay*, 794 F.2d 722, 724 n.8 (D.C. Cir. 1986). *Madley* observed that when Congress revised § 2253(c) it left unchanged the phrase "'the detention complained of arises out of process issued by a State court,'" and "made no effort to disapprove *Garris*."

---

*Terry v. Deeboo*, 473 F. App'x 282, 283 (4th Cir. 2012), *Wilson v. U.S. Parole Comm'n*, 652 F.3d 348, 351–52 (3d. Cir. 2011). While we agree with the dissent that "as a general rule, we decline to create a circuit split unless there is a compelling reason to do so[,]" *Padilla-Ramirez v. Bible*, 882 F.3d 826, 837 (9th Cir. 2017) (internal quotation marks and citations omitted), we find compelling reasons to do so here, including the ordinary meaning of the word "state" and Congress's omission of a clear indication that the term "State court" includes the District of Columbia in § 2253(c)(1)(A).

*See* 278 F.3d at 1309. Because Congress is "presumed to adopt existing judicial interpretations of a statute when it re-enacts without change[,]" *Madley* reasoned that *Garris*'s decision and Congress's later enactment of AEDPA means that "a court of the District is a state court for the purposes of [§ 2253(c)]." *Id.* (citing *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)).

We disagree. At the time Congress passed AEDPA, it was not well established that the phrase "the detention complained of arises out of process issued by a State court" included the District of Columbia Superior Court. In fact, *Garris* appears to be the sole federal decision before the passage of AEDPA that had interpreted the phrase to include the District of Columbia Superior Court. *See id.; Garris,* 794 F.2d at 724 n.8. The only other court of which we are aware to consider the District of Columbia Superior Court issue before AEDPA was passed was a Tenth Circuit decision, *Blango v. Thornburgh*, 942 F.2d 1487 (10th Cir. 1991), in which the court declared the issue was "still an open question" and expressly declined to resolve it. *See id.* at 1488 n.1 ("[W]e express no view on the matter" of "[w]hether prisoners sentenced by the District of Columbia Superior Court . . . should be treated as prisoners under sentence of state court[.]"). *Blango* made no mention to *Garris* in its opinion, which suggests that *Garris's* declaration on the issue was either unknown or unremarkable.

Indeed, *Garris* declared its view in a single footnote, and thus the issue was far from the central focus of the case. *See* 794 F.2d at 724 n.8. Rather, the main issue in *Garris* was whether the court *should* issue a certificate of probable cause to the prisoner, not whether the prisoner *needed* one. *See id.* at 725 ("[W]e are called upon to determine whether we

should [issue a certificate of probable cause.]"). *Garris*, the sole case to state that the District of Columbia Superior Court is a state court for purposes of a certificate of probable cause under § 2253(c) prior to AEDPA, does not demonstrate that such an interpretation was well-settled.

Nor does the passage of AEDPA suggest that Congress approved of *Garris*'s holding. There is no evidence that Congress approved, or was even aware of, *Garris*'s view when it enacted AEDPA. Instead, "Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases[.]" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003); *see also Williams v. Taylor*, 529 U.S. 362, 386 (2000). Congress shortened the time for prisoners to file habeas petitions; before AEDPA, "state prisoners had almost unfettered discretion in deciding when to file a federal habeas petition." *Calderon v. U.S. Dist. Ct. (Beeler)*, 128 F.3d 1283, 1286 (9th Cir. 1997), *partially overruled on other grounds by Calderon v. U.S. Dist. Ct. (Kelly)*, 163 F.3d 530, 540 (9th Cir. 1998), *abrogated on other grounds by Garceau*, 538 U.S. at 206. But "AEDPA dramatically changed this landscape, shortening the time for filing a federal habeas petition to one year." *Id.*

Related to Congress's goal of shortening the time period for petitioners to file federal habeas petitions, it also sought to promote principles of federalism and respect for state court adjudications. *See Shinn v. Ramirez*, 142 S.Ct. 1718, 1730–32 (2022) (describing AEDPA's design in preserving states' primary role in criminal law enforcement); *Williams v. Taylor*, 529 U.S. 420, 436 (2000) ("There is no doubt Congress intended AEDPA to advance [the principles of comity, finality, and federalism.]"); *Cook v. Kernan*, 948 F.3d 952, 965 (9th Cir. 2020) (outlining the deferential

standard of review for habeas petitions filed on behalf of petitioners in state custody and which were adjudicated in state court).

Here, the issue we resolve—whether the District of Columbia Superior Court is considered a "State court" for purposes of deciding whether Congress requires a COA— does not implicate the main purposes for which Congress passed AEDPA.  Thus, we decline to presume that Congress decided, in re-codifying the relevant language after *Garris's* holding, that the District of Columbia Superior Court counts as a "State court" for purposes of § 2253.

Even if the presumption on which *Madley* relies should apply to this case, that presumption must yield to the "cardinal canon" that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l. Bank v. Germain*, 503 U.S. 249, 253–54 (1992); *see also Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) ("Where . . . the words of a statute are unambiguous, the judicial inquiry is complete.") (cleaned up).  Because the plain meaning of the word "state" does not include the District of Columbia, and because Congress has expressly defined "state" to include the District of Columbia as a state in other contexts, we hold that § 2253(c)'s language, "in which the detention complained of arises out of process issued by a State court," does not include the District of Columbia Superior Court.  Prisoners whose detention arises out of process issued by a District of Columbia court are not required to obtain a COA to appeal a federal district court's denial of habeas relief.  Thus, the COA jurisdictional requirement does not pose a barrier to Eldridge's appeal.

## III.

Next, we must decide whether the district court properly dismissed Eldridge's instant petition as an abuse of the writ. We review dismissal of a habeas petition de novo. *Alaimalo v. United States*, 645 F.3d 1042, 1047 (9th Cir. 2011).

The abuse of the writ doctrine "forbids the reconsideration of claims that were or could have been raised in a prior habeas petition." *Kelly*, 163 F.3d at 538. Under this doctrine, "a successive petition that raises *identical* grounds for relief as a prior petition must be dismissed unless the petitioner can show (1) cause for bringing a successive petition and that prejudice would result or (2) that a fundamental miscarriage of justice would result from failure to entertain the claim." *Alaimalo*, 645 F.3d at 1049 (emphasis added). The doctrine "refers to a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions." *McCleskey v. Zant*, 499 U.S. 467, 489 (1991).

Liberally construing Eldridge's current petition, as we must, Eldridge primarily argues that the Commission's decision to give him a three-year set-off in 2019 is arbitrary and capricious, because the Commission gave him a one-year set-off in 2018 and both parole requests were denied for the same reason—namely, he was an untreated sex offender. *See Draper v. Rosario*, 836 F.3d 1072, 1080 (9th Cir. 2016) (noting court must construe *pro se* filings liberally)[11].

---

[11] Eldridge proceeded *pro se* when filing his original habeas petition. The court later appointed counsel to represent Eldridge in this appeal. Order at 1, *Eldridge v. Blanckensee*, No. 21-15616 (9th Cir. Oct. 20, 2021), ECF No. 6.

On appeal, Eldridge argues that this habeas petition was not abusive "because it contained claims that he could not have raised in his prior habeas filings—challenges to the 2018 and 2019 denials of parole, which had not occurred when he filed those prior habeas petitions." Thus, Eldridge argues his 2019 denial is not second or successive. And even if it is second or successive, Eldridge argues he has good cause for not raising his challenge in 2016 because he could not foresee the Commission's future rationales in 2018 and 2019.

Our discussion in *Brown v. Muniz*, 889 F.3d 661, 674 (9th Cir. 2018) guides our analysis here. Drawing on pre-AEDPA abuse of the writ principles, we stated that "to determine whether [a claim] is 'second or successive,' [we] must look to the substance of the claim . . . and decide whether the petitioner had a full and fair opportunity to raise the claim in the prior application." *Id.* (quoting *Magwood v. Patterson*, 561 U.S. 320, 346 (2010) (Kennedy, J., dissenting)). "[A] petitioner 'had no fair opportunity to raise the claim in the prior application' if '[1] the claim was not yet ripe at the time of the first petition, or [2] where the alleged violation occurred only after the denial of the first petition.'" *Id.* (quoting *Magwood*, 561 U.S. at 345–46 (Kennedy, J. dissenting)). Here, looking to the substance of Eldridge's claim—that the Commission acted arbitrarily and capriciously in 2019 when it issued a three-year set-off—Eldridge did not have a fair opportunity to raise this claim in 2016 or 2018 because "the alleged violation occurred only after the denial of" his previous habeas petitions. *Id.*

Additionally, the district court did not address the merits of the set-off issues in its decision denying Eldridge's habeas petition in 2016, even though Eldridge raised the issue. *See Eldridge v. Oliver*, 2017 WL 2812824, at *1–8. Instead, it

denied his petition on other grounds. *See id.* at \*5–9. And the district court dismissed Eldridge's 2018 petition, which also raised the three-year set-off issue, without deciding it on its merits. *See Eldridge v. U.S. Parole Comm'n*, 2018 WL 10426189, at \*2. Thus, because no court has addressed Eldridge's three-year set-off claims regarding his 2016 parole denial, he did not abuse the writ by raising the 2019 denial issue in his instant habeas petition. *See Hill v. State of Alaska*, 297 F.3d 895, 899 (9th Cir. 2002) ("Because the district court has never addressed [petitioner's] claims relating to mandatory parole on the merits, and those claims could not have been included in earlier petitions challenging his conviction and sentence, [petitioner] is not obliged to secure this court's permission prior to filing his habeas petition in the district court.").

The Government resists Eldridge's argument and cites to a Third Circuit decision in *Benchoff v. Colleran*, 404 F.3d 812 (3d. Cir. 2005) and an unpublished Eleventh Circuit decision in *Watson v. Coleman*, 644 F. App'x 996 (11th Cir. 2016). Both cases are distinguishable from Eldridge's situation.

Benchoff was denied parole three times. *See* 404 F.3d at 817–18. Between the second and third denial, Benchoff filed a habeas petition making claims related to his underlying criminal trial. *See id.* at 813–14. Benchoff filed another habeas petition between the second and third denial, this time challenging his first two parole denials. *See id.* at 814. Benchoff's third parole denial was initially for the same reason as the first two, namely that the parole board had determined that "the fair administration of justice cannot be achieved through [his] release on parole." *Id.* (internal quotation marks omitted). The Third Circuit found that "even one of the parole denials would have been sufficient

for Benchoff to formulate his complaint." *Id.* at 818. Because Benchoff did not have a legitimate excuse for failing to raise the denial of the due process parole claim in his first petition, which also challenged his underlying criminal trial, the court found an abuse of the writ despite Benchoff's argument that he could not have challenged his third parole denial in his first petition. *Id.* at 818–19.

Eldridge's case differs from *Benchoff*. Eldridge's current petition raises a specific challenge to the Commission's decision to issue a three-year set-off in 2019, after the Commission had issued him a one-year set-off for similar reasons in 2018. Unlike in *Benchoff*, in which the petitioner raised the same claims because the parole board's language in its notice of denial was identical, 404 F.3d at 818, Eldridge did not make an identical argument when he filed his 2016 and 2018 habeas petitions because he could not have known of the subsequent one-year set-off that was issued later in 2018. Thus, he did not abuse the writ when filing the instant petition.

It is true, as the Government highlights, that Eldridge challenged the Commission's 2016 decision to issue him three-year set-offs in his 2016 petition, arguing it was "punitive" because it would not take three years to complete the sex offender treatment program. And in his 2018 petition, he argued his 2016 three-year set-off "went beyond the ordinary 12-month rehearing guidelines[.]" But at the time Eldridge lodged his 2016 and 2018 petitions challenging his 2016 set-off, the Commission had never issued him a one-year set-off, much less one for similar reasons when it issued the three-year set-offs. Similarly, the Commission had not yet issued its 2019 decision. Thus, the Commission's 2018 and 2019 decisions served as necessary factual predicates for Eldridge's current petition, and these

facts were unavailable to Eldridge at the time of his 2016 and 2018 petitions.

The Government's citation to the unpublished Eleventh Circuit disposition in *Watson* similarly does not alter our analysis. In *Watson*, a D.C. Code offender was convicted in 1978 and sentenced to serve a minimum of 30 years in prison. *See* 644 F. App'x at 998. Watson had his first parole hearing in 2004, where the Commission denied parole and calculated his eligible parole date using the 2000 guidelines. *See id.* In 2009, Watson filed a habeas petition challenging the calculation of his eligible parole date. *See id.* The district court rejected this claim, and the Eleventh Circuit affirmed. *See id.* at 999. Watson then filed another habeas petition, alleging among other things, that the Commission's use of the 2000 guidelines violated the Ex Post Facto Clause when the Commission denied him parole in 2011. *See Watson v. Warden, FCC Coleman-USP I*, 5:12-491-0C-27, 2015 WL 78775, at *2 (M.D. Fla. Jan. 6, 2015). The Eleventh Circuit held that the abuse of the writ doctrine barred his claim because his "central allegation—that the 2000 guidelines resulted in him receiving a harsher sentence than what was available at the time of his crime—has been available to him since the denial of parole in 2004." *Watson*, 644 F. App'x at 1000. Thus, even though he could not have challenged his 2011 eligible parole denial when he filed his 2009 petition, the Eleventh Circuit still found that the abuse of the writ doctrine applied. *See id.*

Eldridge's current petition differs from Watson's: unlike Watson, who could have alleged the Ex Post Facto violation in 2009 because Watson knew all the relevant facts at that time, Eldridge did not have all the necessary facts in 2016 to argue that the Commission abused its discretion in 2019 in light of the Commission's 2018 decision.

Additionally, no district court has ruled on Eldridge's set-off claims on the merits, even though Eldridge raised the three-year set-offs in his 2016 and 2018 petitions.  In fact, a similar occurrence happened in *Watson*.  Prior to Watson's 2009 petition, he had filed "numerous" habeas challenges arguing that the Commission incorrectly calculated his parole eligibility date.  *See Watson*, 644 F. App'x at 998. The district court originally dismissed Watson's 2009 petition as an abuse of the writ, but the Eleventh Circuit held that his petitions "had never been adjudicated on the merits and that his case had been improperly dismissed by the district court."  *Id.* at 999 (citing *Watson v. United States*, 392 F. App'x 737, 742 (11th Cir. 2010)).  Thus, just as the Eleventh Circuit held it would be inappropriate to dismiss Watson's 2009 petition as an abuse of the writ given the district court's failure to decide the merits of his previous petitions, we hold that Eldridge's instant petition is not an abuse of the writ because his precise claim has not been adjudicated on the merits.  *See id.*

## IV.

In conclusion, we hold that Eldridge need not obtain a COA because Congress did not define or include the District of Columbia Superior Court as a "State court" in 28 U.S.C. § 2253(c), where it had expressly done so in that and other statutes.  We further hold that the district court erred in dismissing Eldridge's instant petition as an abuse of the writ when Eldridge could not have possibly raised the same claims in prior petitions. We reverse and remand the case to the district court to decide Eldridge's instant petition on its merits.

BUMATAY, Circuit Judge, dissenting:

Congress has determined that we have no jurisdiction to review habeas petitions filed by prisoners detained out of process "issued by a State court" unless the state prisoner first obtains a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). And we may only issue a certificate of appealability "if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2). In this case, we are asked to relitigate a virtually settled question—whether the Superior Court of the District of Columbia is a "State court" under § 2253(c)(1)(A).

Every circuit court to consider this question has reached the same result—that the D.C. Superior Court is a "State court" under habeas law and prisoners challenging detention arising from a D.C. Superior Court conviction must obtain a certificate of appealability before appealing. And this consensus is significant—the D.C., Third, Fourth, Seventh, and Tenth Circuits have all embraced this approach. *See Madley v. U.S. Parole Comm'n*, 278 F.3d 1306, 1310 (D.C. Cir. 2002); *Wilson v. U.S. Parole Comm'n*, 652 F.3d 348, 351–52 (3d Cir. 2011); *Terry v. Deeboo*, 473 F. App'x 282, 283 (4th Cir. 2012) (unpublished); *Sanchez-Rengifo v. Caraway*, 798 F.3d 532, 535 (7th Cir. 2015); *Eldridge v. Berkebile*, 791 F.3d 1239, 1243–44 (10th Cir. 2015).

And, until today, so had we. Ten years ago, our court treated it as settled that "the Superior Court of the District of Columbia qualifies as a state court under 28 U.S.C. § 2253(c)(1)(A)." *Johnson v. Clay*, 539 F. App'x 748 (9th Cir. 2013) (unpublished). To be sure, we did so in a non-precedential memorandum disposition and another panel of this court may disagree with that conclusion. But that we

once thought this proposition of law so uneventful that it didn't warrant a published opinion just shows how widely accepted it is.

Of course, we have "no warrant to ignore clear statutory language on the ground that other courts have done so." *Milner v. Dep't of Navy*, 562 U.S. 562, 576 (2011). But "absent a strong reason to do so," our general practice is to refrain from creating "a direct conflict with other circuits." *United States v. Cuevas-Lopez*, 934 F.3d 1056, 1067 (9th Cir. 2019) (simplified). And here, there's no strong reason. Indeed, given the text and its context, the best reading of § 2253(c)(1)(A) is that the D.C. Superior Court is a "State court." Rather than opening a circuit split, we should have stuck with consensus.

So before considering this appeal, we should have first determined whether Clinton Eldridge deserves a certificate of appealability. On that score, I would conclude he does not. I thus would have dismissed this appeal, and I respectfully dissent.

## I.

Section 2253(c)(1)(A) provides that, "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court." 28 U.S.C. § 2253(c)(1)(A). Thus, when it's required, "[t]he issuance of a certificate of appealability . . . is a jurisdictional prerequisite to appeal in a habeas corpus proceeding." *Lord v. Lambert*, 347 F.3d 1091, 1094 (9th Cir. 2003). Because Eldridge's detention arises from a D.C. Superior Court conviction, our jurisdiction to hear this

appeal turns on whether that court is a "State court" under § 2253(c)(1)(A).

In the majority's view, no certificate of appealability is necessary here because the D.C. Superior Court isn't a "State court." The majority relies mainly on the fact that the District of Columbia is not a "State" under the ordinary meaning of the word. The majority then looks to other federal statutes where Congress has expressly defined "State court" to include the D.C. Superior Court and concludes that Congress's silence in § 2253(c)(1)(A) should be read as a purposeful exclusion.

In fairness, the majority's reading of § 2253(c)(1)(A) is plausible. We all know that D.C. is not a "State." And generally, absent strong textual reasons to do otherwise, we ought to embrace the ordinary meaning of a term. But sometimes, adhering only to ordinary meaning—without understanding legal context—may cross into literalism and blind us to the best reading of a statute. Indeed, "[w]ords are to be understood in their ordinary, everyday meanings— unless the context indicates that they bear a technical sense." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012) ("Reading Law"). And in my view, our duty is always "to 'seek the *best reading* of the statute by interpreting the words of the statute, taking account of the context of the whole statute, and applying the agreed upon semantic canons.'" *Rojas v. FAA*, 989 F.3d 666, 694 n.5 (9th Cir. 2021) (en banc) (Bumatay, J., dissenting in part) (quoting Brett M. Kavanaugh, Fixing Statutory Interpretation, 129 Harv. L. Rev. 2118, 2121 (2016) (emphasis added)). As Learned Hand once wrote, "a sterile literalism . . . loses sight of the forest for the trees." Reading Law, at 356 (quoting *New York Tr. Co. v. Commissioner*, 68 F.2d 19, 20 (2d. Cir. 1933)). Instead, we

must recognize that "[t]he full body of a text contains implications that can alter the literal meaning of individual words." *Id.*

While we should never breezily depart from ordinary meaning, here "the context of the whole statute" and "agreed upon semantic canons" all point to the best reading of § 2253(c)(1)(A) being that "State court" includes the D.C. Superior Court.

## A.

The "prior construction" canon derives from the principle that when Congress enacts legislation borrowing language with a settled meaning, the newly enacted legislation "brings the old soil with it." *Sekhar v. United States*, 570 U.S. 729, 733 (2013) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)). "In other words, when Congress adopts a phrase with a settled judicial interpretation, absent some indication to the contrary, we presume that Congress chose to give the phrase its established meaning." *United States v. Randall*, 34 F.4th 867, 875 (9th Cir. 2022) (simplified). Under the prior-construction canon, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *Chugach Mgmt. Servs. v. Jetnil*, 863 F.3d 1168, 1174 (9th Cir. 2017).

The current version of § 2253(c)(1)(A) was enacted as part of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") in 1996. But Congress didn't operate on a blank slate. Prior to AEDPA, back in 1948, Congress adopted the predecessor of § 2253(c)(1)(A), which required a "certificate

of probable cause" rather than a "certificate of appealability" to appeal a habeas petition. Before 1996, § 2253 said:

> An appeal may not be taken to the court of appeals from the final order in a habeas corpus proceeding where the detention complained of arises out of process issued by a State court, unless the justice or judge who rendered the order or a circuit justice or judge issues a certificate of probable cause.

Pub. L. No. 80-773, § 2253, 62 Stat. 869, 967 (1948).

Ten years before AEDPA, the D.C. Circuit grappled with the status of the modern D.C. court system under the 1948 language. *Garris v. Lindsay* 794 F.2d 722, 724 n.8 (D.C. Cir. 1986) (per curiam). Given that Congress created the D.C. courts to be analogous to State courts, the D.C. Circuit concluded that "District of Columbia prisoners are 'state' prisoners for purposes of this requirement." *Id*.; *see also Milhouse v. Levi*, 548 F.2d 357, 360 n.6 (D.C. Cir. 1976) ("[T]his Court has treated local courts as 'state' courts for the purposes of exhaustion and federal habeas corpus jurisdiction."). That conclusion remained unchallenged up through Congress's enactment of AEDPA and § 2253(c)(1)(A).

When, as here, "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law." *Lorillard*, 434 U.S. at 581. In other words, because § 2253(c)(1)(A) "perpetuat[es] the wording" of the 1948 version, we can "presume[]" that Congress meant to "carry forward" the uncontested interpretation of "State court" from *Garris*. *Tex. Dep't of*

*Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576
U.S. 519, 536 (2015) (quoting Reading Law, at 322). After
all, Congress presumably did not ignore the legal gloss that
the D.C. Circuit—the court with the greatest connection to
the District—placed on the meaning of the words of
§ 2253(c)(1)(A).

The D.C. Circuit followed this analysis in reaffirming its
position that § 2253(c)(1)(A)'s certificate of appealability
requirement applies to D.C. prisoners. *See Madley*, 278 F.3d
at 1309. As Judge Sentelle wrote, "Congress's 1996
amendment to section 2253 left th[e] interpreted language
unchanged and made no effort to disapprove *Garris*." *Id.*
Judges from the Third, Fourth, Seventh, Ninth, and Tenth
Circuits all found this analysis persuasive and relied on
*Madley* to require a certificate of appealability for D.C.
prisoners. *See Wilson*, 652 F.3d at 351–52; *Terry*, 473 F.
App'x. at 283; *Sanchez-Rengifo*, 798 F.3d at 535; *Johnson*,
539 F. App'x at 748; *Eldridge*, 791 F.3d at 1243–44.

To be fair, as the majority points out, the D.C. Circuit is
the only court that had to address whether the pre-AEDPA
§ 2253 applied to D.C. courts. Thus, in the majority's view,
that court's interpretation was not "well-settled" enough to
warrant applying the prior-construction canon. The majority
raises a valid question: What degree of judicial consensus is
needed for an interpretation to be "settled"? In its strongest
form, we can agree that meaning is definitively settled by a
ruling of "a court of last resort." Reading Law, at 323. But
the prior construction canon also applies to "uniform
holdings of lower courts and even to well-established agency
interpretations." *Id.* at 324; *see also Bragdon v. Abbott*, 524
U.S. 624, 645 (1998) ("When administrative and judicial
interpretations have settled the meaning of an existing
statutory provision, repetition of the same language in a new

statute indicates, as a general matter, the intent to incorporate its administrative and judicial interpretations as well."). But "how numerous must the lower-court opinions be, or how prominent and long-standing the administrative interpretation, to justify the level of lawyerly reliance that justifies the canon?" Reading Law, at 325. While there is no universally applicable answer, the "criterion ought to be whether the uniform weight of authority is significant enough that [we] can justifiably regard the point as settled law." *Id.; see also* Caleb Nelson, Statutory Interpretation 454 (2011) (observing that the canon applies to "prominent decisions by lower courts").

Consider *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009). In that case, the Supreme Court examined whether Title IX of the Civil Rights Act allows for parallel and concurrent 42 U.S.C. § 1983 claims. *Id.* at 258. In deciding that question, the Court looked to how Title VI of the Civil Rights Act (after which Title IX was modeled) was understood at the time of Title IX's passage. *Id.* at 258-59. The Court found that Title VI was "routinely interpreted" to allow for parallel § 1983 claims, citing as an example *only* the decisions of the Fifth and Sixth Circuits. *Id.* (citing *Alvarado v. El Paso Indep. Sch. Dist.*, 445 F.2d 1011 (5th Cir. 1971); *Nashville I–40 Steering Comm. v. Ellington*, 387 F.2d 179 (6th Cir. 1967); *Bossier Par. Sch. Bd. v. Lemon*, 370 F.2d 847 (5th Cir. 1967)). The Court "presume[d] Congress was aware of this when it passed Title IX" and "[i]n the absence of any contrary evidence," the Court held that "it follows that Congress intended Title IX to be interpreted similarly." *Id.* at 259.

Here, unlike some of our sister courts, I would not rely solely on *Garris* to give us a "well-settled" meaning. But other clues reinforce carrying forward the D.C. Circuit's

interpretation of § 2253 after AEDPA. Include, for example, the significant judicial consensus that the District of Columbia's local courts were to be viewed as state courts. In 1970, Congress created the "new local court system" of trial and appellate courts of general jurisdiction in the District of Columbia and "transferred in its entirety . . . responsibility for processing local litigation" to the D.C. Superior Court. *Swain v. Pressley*, 430 U.S. 372, 375 (1977) (citing the District of Columbia Court Reform and Criminal Procedure Act of 1970, 84 Stat. 475, Pub. L. No. 91-358, Title I, § 111 (1970); D.C. Code § 11–101); *see also* Theodore Voorhees, *The District of Columbia Courts: A Judicial Anomaly*, 29 Cath. U. L. Rev. 917 (1980) (providing a history of courts in the District of Columbia). Congress then took pains to establish the D.C. Superior Court as a "State court" for jurisdictional purposes. *See* 28 U.S.C. §§ 1257, 1451(2), 2113.

The Supreme Court thus recognized that "[o]ne of the primary purposes" of the local courts' creation "was to restructure the District's court system so that the District will have a court system *comparable to those of the states*." *Pernell v. Southall Realty*, 416 U.S. 363, 367 (1974) (simplified) (emphasis added). The result was "a system of courts analogous to those found in the States." *Swain*, 430 U.S. at 375 n.4. And based on Congress's actions, the Supreme Court viewed judgments of the District of Columbia Court of Appeals, the highest court in the District's local court system, as it would the judgments of the "highest courts of the several States." *Pernell*, 416 U.S. at 368 (simplified).

So, along with *Garris*, we can presume that Congress was aware of the judicial consensus that the D.C. Superior

Court was viewed as a "State court" when it enacted
§ 2253(c)(1)(A).  Even so, I think we should require more
evidence before departing from ordinary meaning.  And
here, contextual evidence tilts the analysis in favor of
reading "State court" to include the D.C. courts.

**B.**

Statutory language "cannot be interpreted apart from
context."  *Smith v. United States*, 508 U.S. 223, 229 (1993).
Thus, one of the most important interpretive tools we have
is the "whole-text canon, which calls on the judicial
interpreter to consider the entire text, in view of its structure
and of the physical and logical relation of its many parts."
*Rojas*, 989 F.3d at 696 n.6 (Bumatay, J., dissenting in part)
(quoting Reading Law, at 167).  So when interpreting a
statutory phrase, we consider "the language itself, the
specific context in which that language is used, and the
broader context of the statute as a whole."  *Robinson v. Shell
Oil Co.*, 519 U.S. 337, 341 (1997).

And sometimes, this broader context means recognizing
that laws are "part of an entire *corpus juris*," Reading Law,
at 252, and may require analyzing the use of the same terms
across related provisions or laws.  At its most useful, this
consistent-use canon "provides that identical words and
phrases within the same statute should normally be given the
same meaning."  *Powerex Corp. v. Reliant Energy Servs.,
Inc.*, 551 U.S. 224, 232 (2007).  But, as a matter of logic, the
interpretive principle may extend to identical terms across
different statutes closely related in time and subject matter—
this is sometimes called the "in pari materia" canon.  *See
Erlenbaugh v. United States*, 409 U.S. 239, 243–44 (1972).
After all, "a legislative body generally uses a particular word
with a consistent meaning in a given context" and it's a fair

assumption that "whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject." *Id.*; *see, e.g.*, *United States v. Stewart*, 311 U.S. 60, 63–65 (1940) (interpreting the phrase "income derived" similarly across two statutes because they dealt with the same subject matter—tax exemptions for farm loan bonds).

First, look at the use of "State" elsewhere in AEDPA. Congress defined "State" two times in AEDPA. And both times, Congress expressly said that a "State" includes the "District of Columbia":

- **AEDPA § 235, Closed circuit televised court proceedings for victims of crime:** "As used in this section, the term "State" means any State, the District of Columbia, or any possession or territory of the United States." 34 U.S.C. § 20142(f).

- **AEDPA § 811, Federal Bureau of Investigation:** "For purposes of this paragraph, the term 'State' means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, American Samoa, Guam, and the Commonwealth of the Northern Mariana Islands[.]" 28 U.S.C. § 531 Statutory Notes.

Thus, when Congress felt the need to define "State" in AEDPA, it had the District of Columbia in mind. While not dispositive in our case, it provides further evidence of what Congress meant by "State court" in § 2253(c)(1)(A). *See, e.g.*, *United States v. Garcia-Paz*, 282 F.3d 1212, 1214 (9th

Cir. 2002) (importing the definition of "merchandise" from Title 19 of the U.S. Code into Title 18 because the two statutes were "part of the same act," even though the Title 19 definition was expressly limited to "the purposes of th[at particular] chapter").

Second, at the time of AEDPA's enactment, *every time* Congress defined "State court" in a Title 28 jurisdictional statute, the definition invariably included the District of Columbia's local court system:

- **28 U.S.C. § 1257(b):** defining "highest court of a State" to include "the District of Columbia Court of Appeals" for the writ of certiorari

- **28 U.S.C. § 1451(1)–(2):** defining "State court" to include "Superior Court of the District of Columbia" and "State" to include "the District of Columbia" for removal jurisdiction

- **28 U.S.C. § 2113:** defining "State court," "State courts," and "highest court of a State" to include "the District of Columbia Court of Appeals" for filing the writ of certiorari in criminal appeals

And whenever Congress sought to define a "State" for jurisdictional questions, it included D.C.:

- **28 U.S.C. § 1332(e):** defining "States" to include "the District of Columbia" for diversity jurisdiction

- **28 U.S.C. § 1367(e):** defining "State" to include "the District of Columbia" for supplemental jurisdiction

To my knowledge, *no* jurisdictional provision of Title 28 excludes the D.C. Superior Court from the definition of "State court."

With such uniformity in jurisdictional statutes, we can presume that Congress was "aware of all previous statutes on the same subject," *Erlenbaugh*, 409 U.S. at 244, and used "State court" in § 2253(c)(1)(A) like it did in other jurisdictional provisions—to include the D.C. Superior Court.  In other words, absent a reason to believe otherwise, "State court" in § 2253(c)(1)(A) takes on a legal (rather than a literal) meaning, and we should interpret the phrase consistently with other jurisdictional provisions.  So I disagree with the majority's view that silence in § 2253(c)(1)(A) reflects Congress's intent to exclude D.C. prisoners from the certificate of appealability requirement.  Instead, the better view is that Congress was legislating within a well-known legal backdrop that included the D.C. Superior Court within the legal meaning of "State court."

Also, contrary to the majority's reading, *Palmore v. United States*, 411 U.S. 389 (1973), supports this reading of "State court."  The majority argues that *Palmore* shows that we can't treat the District as a "State" for all purposes.  Of course, that's true.  Without strong textual evidence otherwise, we should construe that term to apply only to the 50 States.  So in considering whether a provision of the District of Columbia Code counts as a "statute of any State" under 28 U.S.C. § 1257, the Court said it does not.  *Palmore*, 411 U.S. at 395.  That's because "nowhere in § 1257, or *elsewhere*," had Congress ever identified the D.C. Code as a

"state statute." *Id.* (emphasis added). But that's not the case when it comes to D.C. courts. Congress *has* identified them as a "State court" "elsewhere"—in fact, it has done so at least three times within Title 28. *See* 28 U.S.C. §§ 1257, 1451(2), 2113. So *Palmore* confirms that we ought to look to related provisions of law to determine the meaning of a jurisdictional term like "State court."

\* \* \*

All told, textual and contextual evidence supports the overwhelming consensus among courts that the D.C. Superior Court is a "State court" for purposes of the certificate of appealability requirement. *See also* O'Neal Smalls, *Habeas Corpus in the District of Columbia*, 24 Cath. U. L. Rev. 75, 85 (1974) ("The history of the [District of Columbia Court Reform and Criminal Procedure] Act, its language, and experience with the local courts indicate that the District of Columbia Superior Court and Court of Appeals should be treated, at least for habeas corpus purposes, as state courts[.]"). While the question is concededly a close one, we should have declined to open a circuit split.

## II.

Because the D.C. Superior Court is a "State court" within the meaning of § 2253(c)(1)(A), we should have required Eldridge to obtain a certificate of appealability before exercising jurisdiction over this appeal. When the district court denies a certificate of appealability on procedural grounds, we only issue such a certificate when a prisoner shows both that (1) "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and (2) "jurists of reason would find it debatable whether the district court was correct in its

procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Eldridge's constitutional claim fails to meet the first prong of this standard and so we should have declined a certificate of appealability and dismissed this appeal.

Eldridge alleges that the U.S. Parole Commission violated the Ex Post Facto Clause in its application of parole guidelines. In 1984, Eldridge was convicted of several criminal offenses, including rape, armed robbery, and burglary. The D.C. Superior Court sentenced him to a term of 40 to 120 years of imprisonment. After he became eligible for parole and was initially denied, the Commission again denied him parole on rehearings in 2010, 2013, 2016, 2018, and 2019. At the time of Eldridge's conviction, 1972 parole guidelines governed. Under those guidelines, prisoners denied parole after serving sentences of five years or longer were eligible for a parole rehearing "ordinarily" after a one-year set-off period, but the parole board had discretion to "establish a rehearing date at any time it fe[lt] such would be proper." 9 D.C.R.R. § 103 (1972); *see also Daniel v. Smoot*, 316 F. Supp. 3d 79, 82 (D.D.C. 2018). In 2000, the guidelines changed. The 2000 guidelines lengthened the "presumptive" set-off period to three years while permitting the Commission to shorten that period at its discretion. *Smoot*, 316 F. Supp. 3d at 83 (quoting 28 C.F.R. § 2.75(a)(1)(iv), (e)).

In his petition, Eldridge argues that the Commission improperly applied the longer 2000 guidelines "set-off" period to his 2010, 2013, 2016, and 2019 parole rehearings, rather than the shorter 1972 guidelines period. The Ex Post Facto Clause forbids laws "that change[] the punishment, and inflict[] a greater punishment, than the law annexed to the crime, when committed." *Peugh v. United States*, 569 U.S. 530, 532–33 (2013) (simplified); *see* U.S. Const. art. I,

§ 9, cl. 3.  A denial of parole can violate the Ex Post Facto Clause when the retroactive use of revised guidelines creates "a sufficient risk of increasing" the duration of a prisoner's incarceration.  *Garner v. Jones*, 529 U.S. 244, 250 (2000) (simplified).

Eldridge is right that the Commission used the 2000 guidelines in scheduling his 2010 and 2013 rehearings.  But even so, Eldridge can't show an ex post facto violation. Because the Commission continued to deny Eldridge's parole after his 2013 rehearing, he would not have been released any earlier under the proper one-year set-off period. Thus, the erroneous use of the 2000 guidelines in 2010 and 2013 did not result in any increase in Eldridge's incarceration and his constitutional challenge to those parole denials fails.  *See Garner*, 529 U.S. at 250.

Elridge's claims related to his 2016 and 2019 rehearings fare no better.  The Commission plainly used the appropriate 1972 guidelines for those rehearings.  While the Commission imposed three-year set-off periods for those rehearings, it did so under the 1972 guidelines' discretionary authority to extend the "ordinary" one-year period.  *See* 9 D.C.R.R. § 103 (1972).  Take the 2016 rehearing.  The Commission expressly said that the "ordinary" one-year set-off period was improper because Eldridge needed to complete drug and sex offender treatment programs.  The same occurred in 2019.  Then, the Commission acknowledged that it was "exceeding the normal rehearing schedule" because Eldridge was "an untreated sexual predator."  Thus, it's not debatable that the Commission applied an ex post facto law; it did not.

Even if the Commission did, Eldridge still can't succeed because he only challenges the extended set-off periods—

not that the Commission should have released him under the 1972 guidelines. In *California Department of Corrections v. Morales*, 514 U.S. 499 (1995), the Court considered the retroactive application of a California law that allowed the state parole board to hold hearings every three years rather than the annual rehearing required by law at the time of the offender's crime. *See id.* at 503. Because the amended law did not change the substantive standards for parole eligibility and only lengthened the set-off period, the Court held the amendment "simply alters the method to be followed in fixing a parole release date under identical substantive standards." *Id.* at 508 (simplified). The new law only relieved the parole board from conducting time-consuming annual parole hearings for offenders "who have no reasonable chance of being released." *Id.* at 507. In this situation, the retroactive application of the law would only result in "the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment" for the defendant. *Id.* at 509. Because there was no basis to conclude that the longer set-offs under the new law "would extend any prisoner's actual period of confinement," they didn't alter the "quantum of punishment," and so did not create an ex post facto violation. *Id.* at 513 (simplified). Thus, Eldridge's constitutional claims must fail.

For these reasons, Eldridge is not entitled to a certificate of appealability.

## III.

While not an easy decision, the weight of interpretive guidance counsels against creating a circuit split here. I would instead follow our sister circuits and read § 2253(c)(1) harmoniously with prior court decisions, the

rest of AEDPA, and related jurisdictional provisions. We thus should have interpreted "State court" to include the D.C. Superior Court. Under this reading, Eldridge needed a certificate of appealability, which is unwarranted here. We should have dismissed this case.

I respectfully dissent from the judgment of the court.